[No. E007605. Fourth Dist., Div. Two. Aug. 14, 1990.]

CONNIE BARRETT et al., Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
PAUL HUBBS CONSTRUCTION COMPANY et al., Real Parties in
Interest.

**COUNSEL**

Sanford M. Gage and Jonathan T. Zackey for Petitoners.

No appearance for Respondent.

Thompson & Colegate, Michael A. Goldware, Haight, Brown & Bonesteel, Elliott D. Olson, Roy G. Weatherup, Rita Gunasekaran and Gary K. Kwasniewski for Real Parties in Interest.

**OPINION**

**McDANIEL, J.***—

### INTRODUCTION

Plaintiffs Connie Barrett, the widow of Harlan Barrett (decedent), and Harlan John Barrett, the minor child of decedent (collectively referred to as plaintiffs), have petitioned us for a writ directing the superior court to vacate its order granting defendants Paul Hubbs Construction Company's and Caterpillar Corporation's (collectively referred to as defendants) motion for summary judgment or summary adjudication of issues, which order deleted from plaintiffs' wrongful death suit one of their theories for recovery, namely that based on strict products liability.

We conclude that plaintiffs in a wrongful death suit may use strict products liability as a theory for recovery.

### FACTS

As best as can be gleaned from the record accompanying the petition, decedent was employed by the Standon Company, Inc.

While so employed, he was transporting a Caterpillar 988A earthmover which was loaded on a "low-boy" trailer towed by an International Transtar 4300 tractor. The Caterpillar 988A earthmover was owned by defendant Paul Hubbs Construction Company and leased to the Standon Company.

Because of the load he was towing, decedent was unable to pass across a small dirt mound on an unpaved portion of the street upon which he was travelling. Decedent therefore released the restraints which held the earthmover on the trailer, and began to drive it off the trailer. The trailer drifted backwards, and the earth mover rolled off and over, crushing decedent and causing his instantaneous death.

Plaintiffs brought suit against defendants on their own behalf for the wrongful death of decedent who was husband and father of plaintiffs, respectively. Plaintiffs' suit consisted of "causes of action" which were denominated as: (1) negligence; (2) strict liability; (3) breach of implied warranty; and (4) "wrongful death." ■ More properly characterized,

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

however, the plaintiffs' suit consisted of but one true "cause of action," that cause of action being for the injury they had suffered as a result of the wrongful death of the decedent (see 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 25, at p. 69), and the four "causes of action" were actually counts based on the same primary right of plaintiffs and the same primary duty of defendants, each of which merely alleged additional circumstances out of which the primary right and primary duty arose. (See *Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 796 [126 Cal.Rptr. 225, 543 P.2d 593]; *Kaufman & Broad Bldg. Co.* v. *City & Suburban Mortg. Co.* (1970) 10 Cal.App.3d 206, 215 [88 Cal.Rptr. 858].) Each set of different circumstances, in turn, was differentiated by reference in the alternative to legal theories pertaining to the nature of the wrongfulness of defendants' acts, i.e., "negligence," "strict liability" and "breach of warranty."[1] (See 4 Witkin, Cal. Procedure, *supra*, Pleading, § 25, at p. 69.)

Defendant Paul Hubbs Construction Company (defendant Hubbs) made a motion for judgment on the pleadings on the ground that plaintiffs' second and third counts failed to state facts sufficient to constitute causes of action for strict liability and for breach of implied warranty. Defendant Hubbs asserted, contrary to what will apply as a result of our holding here, "strict liability in tort will not support a cause of action for wrongful death." Defendant's motion was granted as to the breach-of-implied-warranty count, with leave to plaintiffs to amend that cause of action, but denied as to the strict liability count.

Defendant Hubbs later brought a motion for summary judgment as to plaintiffs' second count based on strict liability, on the following grounds:

(1) plaintiffs had no standing to sue on a theory of strict liability in tort;

(2) strict liability in tort would "not support a wrongful death cause of action;" and

(3) a distributor of secondhand or used machinery may not be held liable on a theory of strict liability in tort.

Defendant Caterpillar Corporation (defendant Caterpillar) joined in this motion for summary judgment.

Defendants' motion as to plaintiffs' count for strict liability was granted. Although no formal order appears in the record, despite the direction in the minute order that defendants were to prepare a formal order within 15

---

[1] Thus, plaintiffs' "cause of action" for "wrongful death," which is stated in a separate "count," is not a proper count, because it does not amount to a different legal theory of the nature of defendants' wrongful act.

days, the minute order indicates that the motion was granted because "[plaintiffs] have failed to plead and prove a 'wrongful act or neglect' of moving party."

Plaintiffs then petitioned this court for a writ of mandate directing the superior court to vacate its order just noted and to enter a new order denying the motion. If their petition were granted, it would enable their action to proceed to trial on the basis of all their theories of defendants' wrongful acts, including strict liability.

We issued an alternative writ for several reasons. First, the issue presented, curiously enough, has never been the subject of a published opinion.[2] Second, the order granting defendants' motion for summary judgment as to plaintiffs' second count effectively bars a substantial portion of plaintiffs' case from being heard on the merits. More particularly, were we not to issue the writ, were plaintiffs not to prevail on their other two theories, and were the order here under review determined to have been incorrect, then a second trial would be required, with the attendant waste of judicial resources. (See, e.g., *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553, 557-558 [145 Cal.Rptr. 657] and cases cited therein.)

### ISSUE ON APPEAL

Defendant takes the position that the term "wrongful act," as used in Code of Civil Procedure section 377, means an intentional or "fault-based" act, that strict liability involves unintentional and nonfault-based acts, and that therefore the Legislature did not intend to allow plaintiffs to use strict liability as one possible legal theory of recovery in an action for wrongful death. We disagree, and for the reasons noted below, conclude that the term "wrongful act," as used in Code of Civil Procedure section 377 (hereafter section 377), means a "tortious act." Because the act of placing a defective product on the market is a "tortious act," we further conclude that strict products liability is a viable legal theory as a basis for recovery in an action for wrongful death brought under section 377.

---

[2] Apparently, most commentators have assumed that the heirs of a decedent killed by a defective product may recover using a strict products liability theory. (See, e.g., Wallach & Boone, Cal. Tort Guide (Cont.Ed.Bar.2d ed. 1979) § 11.7, at p. 198; Brisbois, Cal. Products Liability: Law and Practice (1985) § 361, at pp. 435-436; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1295, at p. 749 ("Strict liability, like negligence and warranty liability, is imposed for physical injury to the person or *wrongful death*. (Citations.)" (Italics added.)

Furthermore, many courts and parties have made the same assumption. (See, e.g., *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 771, 779 [174 Cal.Rptr. 348]; *Pease* v. *Beech Aircraft Corp.* (1974) 38 Cal.App.3d 450, 454, 457 [113 Cal.Rptr. 416].)

## Discussion

*Introduction*

■ A cause of action for wrongful death is purely statutory in nature, and therefore " 'exists only so far and in favor of such person as the legislative power may declare.' " (*Justus* v. *Atchison* (1977) 19 Cal.3d 564, 575 [139 Cal.Rptr. 97, 565 P.2d 122], disapproved on another ground in *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 171 [216 Cal.Rptr. 661, 703 P.2d 1]) quoting *Pritchard* v. *Whitney Estate Co.* (1913) 164 Cal. 564, 568 [129 P. 989].) ■ The question, therefore, is whether, when the Legislature enacted Code of Civil Procedure section 377[3] to afford a cause of action to the heirs of a person whose death "was caused by the wrongful act or neglect of another," it intended that such heirs be entitled to recover under a strict products liability theory as included within the statutory characterization of wrongful act.[4]

Our interpretation of the statute's meaning must be guided by the mandate of Code of Civil Procedure section 4, which provides that interpreters of the Code of Civil Procedure must construe each provision of the Code of Civil Procedure "liberally" and with "a view to effect its objects and promote justice." (Code Civ. Proc., § 4; *Ure* v. *Maggio Bros. Co., Inc.* (1938) 24 Cal.App.2d 490, 491 [75 P.2d 534].) We therefore first set out the objectives sought to be accomplished by the Legislature when it enacted Code of Civil Procedure section 377, the "wrongful death act."

---

[3] Code of Civil Procedure section 377, California's "wrongful death act" provides, in relevant part: "(a) When the death of a person is caused by the wrongful act or neglect of another, his or her heirs or personal representatives on their behalf may maintain an action for damages against the person causing the death, or in the case of the death of such wrongdoer, against the personal representative of such wrongdoer, whether the wrongdoer dies before or after the death of the person injured. If any other person is responsible for any such wrongful act or neglect, the action may also be maintained against such other person, or in case of his or her death, his or her personal representatives. In every action under this section, such damages may be given as under all the circumstances of the case, may be just, but shall not include damages recoverable under Section 573 of the Probate Code . . . ."

[4] The terms "strict liability," "strict product liability," and "product liability" are often used interchangeably. The parties here refer to the relevant theory as "strict liability." We, however, refer to it as "strict products liability," because plaintiffs' action is based on allegations that the Caterpillar 988 earthmover and Transtar 4300 tractor unit which were involved in the accident in which the decedent was killed were defective and unsafe for their intended use, and were unreasonably dangerous when used in a reasonably foreseeable manner. See the discussion of the distinction between the terms "strict liability," "strict products liability," and "products liability" by Justice Weiner in *Montez* v. *Ford Motor Co.* (1980) 101 Cal.App.3d 315, 318-319 [161 Cal.Rptr. 578], quoted at page 1188 of this opinion, *infra*.

*The Objective Behind the Enactment of Section 377*

■ There are three distinct public policy considerations involved in the legislative creation of a cause of action for wrongful death: "(1) compensation for survivors, (2) deterrence of conduct and (3) limitation, or lack thereof, upon the damages recoverable." (*Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 584 [114 Cal.Rptr. 106, 522 P.2d 666].)

The first two of these policy considerations are clearly manifested in the language of the statute. As to the compensatory consideration, the statute provides the means by which survivors may be compensated by establishing a cause of action for damages in the decedent's heirs, and reflects a public policy that survivors, most of whom will have depended upon the decedent for some form of support, should be compensated for the loss of such support by the wrongdoer.

As to the deterrent consideration, the statute provides that such a cause of action for damages may be maintained against those whose "wrongful act or neglect" caused the decedent's death, and reflects a public policy that all members of society must keep their conduct within certain norms or else risk paying for the damage caused by their failure to do so. ■ Section 377 was designed to inhibit only certain kinds of conduct, however: by allowing an action for damages only to be brought against one whose conduct was "wrongful" or "negligent," the Legislature clearly recognized that potential liability for damages will only influence the kind of conduct which is subject to conscious control or improvement.

The last of these three policy considerations, the limitation or lack of limitation on damages, is not affirmatively manifested in the language of the statute, which neither states that there are *no* limits on the damages recoverable nor that the damages *are* limited. Although some states and countries, for example Oregon and Mexico, statutorily have prescribed limitations on the measure of damages which may be recovered in an action for wrongful death, other states, including California, have not. (See *Hurtado* v. *Superior Court, supra*, 11 Cal.3d 574, 578-579, 584-585.) By choosing to allow plaintiffs in a wrongful death action to recover damages without any limitation on the measure of damages, California has chosen to "strengthen[] the deterrent aspect of the civil sanction: 'the sting of unlimited recovery . . . more effectively penalize[s] the culpable defendant and deter[s] it and others similarly situated from such future conduct'" (*id.*, at p. 584, quoting Seidelson, *The Wrongful Death Action* (1972) 10 Duq. L.Rev. 525, 528, fn. 12), rather than to protect defendants from excessive financial burdens.

■ Given the three public policy considerations behind the enactment of section 377, it is apparent that our interpretation of the term "wrongful

act," as it is used in that section, should be an interpretation that emphasizes the deterrent aspect of the section, rather than an interpretation which limits the measure of recovery, and an interpretation that recognizes that only conduct which is subject to conscious control or improvement can be deterred by the risk of potential liability for damages. The question then becomes whether interpreting the term "wrongful act" to encompass the act of putting a defective product into the stream of commerce, so as to allow a decedent's heirs to recover damages under a theory of strict products liability (1) emphasizes the deterrent effect of the wrongful death act and (2) takes into account whether the placing of defective products into the stream of commerce is conduct which can be deterred. To answer that question, we must consider (1) the purpose behind the creation of strict products liability as a predicate for liability, (2) the effect of extending the use of strict products liability as a theory of recovery to persons other than the purchasers or users of the defective product, i.e., to the heirs of such persons, and (3) the nature of the conduct which forms the basis for liability for damages under such theory.

*The Purpose Behind the Creation of Strict Products Liability as a Predicate for Liability*

■ The primary purpose of imposing strict products liability "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)

The other purposes, or public policies, behind the creation of the doctrine of strict products liability in tort as a theory of recovery are: "(1) to provide a 'short cut' to liability where negligence may be present but difficult to prove; (2) to provide an economic incentive for improved product safety; (3) to induce the reallocation of resources toward safer products; and (4) to spread the risk of loss among all who use the product. [Citations.]" (*Pierce* v. *Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68, 83 [212 Cal.Rptr. 283, 60 A.L.R.4th 709] and cases cited therein.)

*The Effect of Extending the Use of Strict Products Liability as a Theory of Recovery to Persons Other Than the Purchasers or Users of the Defective Product, i.e., to the Heirs of Such Persons*

■ The four public policies noted above have been furthered by extending the right to recover damages on a theory of strict products liability to those other than the purchasers of the product. Manufacturers of defective

products are liable for injuries not only to the purchaser or user of such products, but to injured bystanders as well; as the court in *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406] pointed out, "[A]n injury to a bystander 'is often a perfectly foreseeable risk of the maker's enterprise, and the considerations for imposing such risks on the maker without regard to his fault do not stop with those who undertake to use the chattel . . . . ' [Citation.]

"If anything, bystanders should be entitled to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable. Consumers and users, at least, have the opportunity to inspect for defects and to limit their purchases to articles manufactured by reputable manufacturers and sold by reputable retailers, whereas the bystander ordinarily has no such opportunities. In short, the bystander is in greater need of protection from defective products which are dangerous, and if any distinction should be made between bystanders and users, it should be made, contrary to the position of defendants, to extend greater liability in favor of the bystanders." (70 Cal.2d at p. 586.)

Extending the use of strict products liability as a theory of recovery to bystanders thus "is to put . . . strict liability on the same footing as negligence [by providing a cause of action] as to all foreseeable injuries." (Prosser & Keeton, Torts (5th ed. 1984) § 100, at p. 704.) ▇▇▇ Extending the right to use such a theory of recovery to a decedent's heirs pursuant to section 377 does the same thing; allowing such heirs to recover for foreseeable injury under this theory fulfills a number of the policies behind both section 377 and the doctrine of tort liability: to deter foreseeable wrongful conduct and to allocate the cost of injury caused by defective products among the industry (and ultimately consumers as a whole), rather than to force innocent survivors to bear such burden alone. Furthermore, failure so to extend the use of a strict products liability theory to a decedent's heirs would have the anomalous effect of "rewarding" the manufacturer of a defective product which *kills* its user, rather than merely *maiming* him or her, by making it more difficult for the deceased user's heirs, who would no longer be able to use the "short cut" theory of strict products liability rather than negligence, to prove liability.

*The Nature of the Conduct Which Forms the Basis for Liability for Damages Under the Theory of Strict Products Liability*

▇▇▇ It is accepted law that the conduct which forms the basis for liability for damages under the theory of strict products liability is tortious in nature. A tort is " 'any wrong, not consisting in mere breach of contract, for which the law undertakes to give to the injured party some appropriate

remedy against the wrongdoer.'" (*Denning* v. *State* (1899) 123 Cal. 316, 323 [55 P. 1000], quoting Cooley on Elements of Torts, 2; see also *Stephen K.* v. *Roni L.* (1980) 105 Cal.App.3d 640, 642-643 [164 Cal.Rptr. 618, 31 A.L.R.4th 383], citing Prosser, Torts (3d ed. 1964) ch. 1, §§ 1 and 4, pp. 1-2, 18, 21 to same effect.) A cause of action based on strict products liability is one which sounds in tort: "A manufacturer is *strictly liable in tort* when an article he [or she] places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 62, italics added.) Strict products liability is "a new tort . . . which extend[s] liability for defective product design and manufacture beyond negligence but short of absolute liability." (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162].)

Torts are described as "wrongs" for which society provides a remedy. The term "wrong" implies some "fault" on the part of the wrongdoer. The fact that placing into the stream of commerce a defective product which causes injury or death makes the manufacturer and distributor of the product liable in tort is therefore some indication that society ascribes some fault to this conduct. ▮ Defendants, however, urge upon us the proposition that strict products liability is imposed regardless of fault, and further contend that an act to which no fault attaches therefore cannot be considered to be a "wrongful act," i.e., the kind of act to which liability attaches under section 377.

Although it is true that some cases state that strict products liability is imposed *regardless* of "fault" (see, e.g., *Elmore* v. *American Motors Corp., supra,* 70 Cal.2d 578, 586: "[a]n injury to a bystander [caused by a defective product] 'is often a perfectly foreseeable risk of the maker's enterprise, and the considerations for imposing such risks on the maker *without regard to his fault* do not stop with those who undertake to use the chattel . . . . '" (italics added)), we believe that the implication defendant attempts to draw from such statements, that defendants held liable under such a theory are "fault-free," does not necessarily follow.

As noted by Justice Weiner, "Strict products liability is a subtle tort doctrine containing nuances which effectively distinguish it from genuine strict liability [also referred to as "absolute liability"]. Strict liability in the latter sense is equivalent to a compensation system which would render product manufacturers automatically liable for all accidents caused by their product. [Citations.] In the tort context of products liability, [on the other hand], a defect is required—*something must be wrong with the product.* In a case based on a manufacturing defect, immediate focus is on the product itself and not on the system that produced the product. [Citation.] Thus,

where the facts do not involve res ipsa loquitur and liability hinges on the manufacturing defect only, as [here], strict products liability is a shortcut to any recovery that might be based on negligence [citation]." (*Montez* v. *Ford Motor Co.*, *supra*, 101 Cal.App.3d 315, 318-319, italics added.)

As another commentator also noted, "The doctrine of strict tort liability is referred to as liability without fault. This is true if the concept of 'fault' is equated with negligence, for in strict liability a plaintiff is relieved of the burden of showing that the seller or manufacturer failed to act in a reasonably prudent manner in the design, production or sale of his product. Strict liability is not absolute liability, however, for the plaintiff must still prove the product was defective at the time it left the control of the defendant. If 'fault' can be equated with the responsibility for placing a defective product into the stream of commerce, then strict tort liability requires a showing of such fault, just as an action for breach of an implied warranty of merchantability requires a showing that the seller was at 'fault' in selling a product that was not of merchantable quality." (1 Madden, Products Liability (2d ed. 1988) § 2.12 pp. 41-42, fn. omitted. See also Schwartz, Comparative Negligence (2d ed. 1986) § 12.2 at p. 198: "Furthermore, Professor Powers has perceptively observed that in spite of some 'judicial opinion' language to the contrary, fault has remained the essence of the test in product liability cases based on failure to design a product properly and failure to warn," quoting Powers, *The Persistence of Fault in Products Liability* (1983) 61 Tex. L.Rev. 777.)

Perhaps one of the strongest indicators that the doctrine of strict products liability does involve fault or wrongfulness is the fact that such a theory of liability will support an award of exemplary damages under certain circumstances. ■ For example, when a manufacturer knowingly places a defective product into the stream of commerce with conscious disregard of the fact that the defect may result in injury to others, exemplary damages can be and are at times awarded. (See, e.g., *Grimshaw* v. *Ford Motor Co. supra*, 119 Cal.App.3d 757, 807-814, approved in *Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 160 [181 Cal.Rptr. 784, 642 P.2d 1305].)

■ Another indicator supporting such conclusion is the fact that the principles of comparative fault, under which responsibility and liability for damage is assigned in direct proportion to the amount of negligence of each of the parties, are applicable to actions founded on strict products liability. In such cases a plaintiff's recovery will be reduced to the extent that his or her own lack of reasonable care contributed to his or her injury. (*Daly* v. *General Motors Corp.*, *supra*, 20 Cal.3d 725, 733-738.) Comparative fault, of course, presupposes fault on the part of those on both sides of the transaction.

Furthermore, foreseeability necessarily involves the possibility of taking action to change the foreseeable occurrence. In actions premised on strict products liability, just as in actions premised on negligence, an element of foreseeability is involved; liability may not be imposed unless the injury results from a use of the product which is reasonably foreseeable. (*Daly* v. *General Motors Corp., supra,* 20 Cal.3d 725, 733.) As discussed above in connection with the public policy of deterrence which underlies the creation of a cause of action for wrongful death as well as the creation of the theory of liability of strict products liability, only conduct which is subject to conscious control or improvement is deterrable via the risk of financial liability. Thus, the fact that there can be no recovery under the theory of strict products liability without some evidence of foreseeability necessarily demonstrates that allowing a plaintiff in a wrongful death action to proceed under such a theory of liability furthers not only the policy of compensating survivors, but also furthers the policy of deterring conduct which is susceptible to conscious control.

*The Doctrine of Ejusdem Generis as Another Basis for Interpretation*

 As discussed above, the policies behind the creation of the wrongful death act, as well as the mandate of Code of Civil Procedure section 4, have led us to the conclusion that the term "wrongful act," as used in section 377, means any *tortious act*. Further support for this interpretation results from the juxtaposition of the term "wrongful act" with the term "neglect" in the section.

 "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. Where the opposite sequence is found, i.e., specific words following general ones, the doctrine is equally applicable, and restricts application of the general terms to things that are similar to those enumerated.

"The doctrine of *ejusdem generis* is an attempt to reconcile an incompatibility between specific and general words so that all words in a statute and other legal instruments can be . . . construed together, and no words will be superfluous. If the general words are given their full and natural meaning, they would include the objects designated by the specific words, making the latter superfluous. If, on the other hand, the series of specific words is given its full and natural meaning, the general words are partially redundant. The rule 'accomplishes the purpose of giving effect to both the particular and the general words, *by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to*

*everything embraced in that class, though not specifically named by the particular words.'* " (2A Sutherland, Statutes and Statutory Construction (4th ed. 1984 rev.) § 47.17, at p. 166, fns. omitted, quoting *National Bank of Commerce* v. *Estate of Ripley* (1901) 161 Mo. 126, 131 [61 S.W. 587, 588], italics added. For a discussion of *ejusdem generis* by California courts, see *People* v. *Hernandez* (1978) 90 Cal.App.3d 309, 315 [155 Cal.Rptr. 1]; *Scally* v. *Pacific Gas & Electric Co.* (1972) 23 Cal.App.3d 806, 819 [100 Cal.Rptr. 501].)

Section 377 refers to the "death of a person caused by the wrongful act or neglect of another." Applying the doctrine of *ejusdem generis* to the phrase "wrongful act or neglect," we first conclude that "neglect" is a specific word, an example of one kind of "wrongful act." Thus, the term "wrongful act" must define a class of behavior, of which "neglect" is a member. Defendant urges that the class defined by "wrongful act" consists of willful or intentional torts; *yet negligence is not a willful or intentional tort.* On the other hand, "wrongful act" has been defined in other cases as meaning simply any tortious conduct, i.e., any act for which the defendant may be liable in tort.[5] This definition of "wrongful act" would include not only intentional and willful torts, but strict products liability as well. Such a definition would serve the public policies behind both the wrongful death statute and strict products liability, and, as noted above, makes sense, given the rationale behind the use of the doctrine of *ejusdem generis* in the interpretation of statutory language.

We therefore conclude, on this basis as well, that "wrongful act" as used in section 377 means any kind of tortious act, including the tortious act of placing defective products into the stream of commerce.

---

[5] Significantly, on this same basis, i.e., that "wrongful act" means *any* tortious conduct, it has been held that Code of Civil Procedure section 340, subdivision (3), which sets a one year statute of limitations in "[a]n action for . . . the death of one caused by the *wrongful act or neglect* of another . . ." (italics added) is applicable in personal injury actions based on the theory of strict products liability. (*Sevilla* v. *Stearns-Roger Inc.* (1980) 101 Cal.App.3d 608, 610 [161 Cal.Rptr. 700]; *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 25 [122 Cal.Rptr. 218]. (See also *Notes and Recent Decisions: Warranty: Tort and Contract Characterization: Statutes of Limitations* (1955) 43 Cal.L.Rev. 546, 551, fns. omitted, citing *Willey* v. *Alaska Packers' Assn.* (N.D.Cal. 1925) 9 F.2d 937, affd. 18 F.2d 8 (9th Cir. 1927); *Sterling Aluminum Products* v. *Shell Oil Co.* (8th Cir. 1944) 140 F.2d 801, cert. den. 322 U.S. 761 [88 L.Ed. 1588, 64 S.Ct. 1279] (1944): "Another indication of legislative intent is the wording of Section 377 of the Code of Civil Procedure, the wrongful death statute. The words 'caused by the wrongful act or neglect of another' which were added to section 340(3) are the identical words previously used in section 377, a statute which has been held to support actions *ex delictu* but not actions *ex contractu*.")

*The Effect of the Fact That the Theory of Strict Products Liability Was Developed After the Creation of the Cause of Action for Wrongful Death*

Defendants point out, historically, that the doctrine of strict products liability was developed after the adoption of the wrongful death statute, and that this fact in and of itself requires us to interpret section 377 so as to exclude such a theory of recovery.

 However, unless there is a clear indication that to do so will interfere with the legislative intent underlying the enactment of a statute, courts will enlarge the terms and provisions of statutes by construction to meet the evolving mores of society. While the powers granted by statute thereby do not change, such powers do apply in different periods to all things to which they are in their nature applicable. Thus, a reference to "transportation," made in the days before the invention of the airplane, may nonetheless later be held to be applicable to transportation by such vehicles. (See *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 635-636 [268 P.2d 723], applying this rule to constitutional interpretation.)

Thus, here, too, the term "wrongful act" may be properly expanded to include a new theory of liability; the theory of strict products liability is not the creation of a new right in plaintiffs or a new duty in defendants, but simply a new way of looking at how the plaintiffs' existing rights have been invaded or affected by a new way of breaching defendants' existing duties.[6]

*The Effect of the Holding in Ault v. International Harvester Company*

Defendant Caterpillar contends that we are bound by the majority opinion in *Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986], to hold that the term "wrongful act" as used in section 377 does not include the act of placing a defective product on the market. In our view, defendant reads too much into that opinion, which interpreted the phrase "to prove negligence or culpable conduct" as used in section 1151 of the Evidence Code as not excluding evidence of subsequent remediation in strict products liability cases.

---

[6] "Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his [or her] rights." (Civ. Code, § 1708.) "Besides the personal rights mentioned or recognized in the Government Code, every person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm, from personal insult, from defamation, and from injury to his [or her] personal relations." (Civ. Code, § 43.)

In *Ault*, the plaintiff brought an action alleging that he had been injured in an accident caused by a defect in the design of a motor vehicle manufactured by International Harvester, and further alleging that he was entitled to recover damages under theories of strict liability, breach of warranty, and negligence.

At trial, plaintiff produced evidence that after the injury, the defendant changed its design by ceasing to use aluminum for the material of the vehicle's gear box and instead to use iron. Judgment was entered in plaintiff's favor, and defendant appealed, alleging that the admission of this evidence of remedial action violated the prohibition contained in section 1151 of the Evidence Code. That code section provided, "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event."

The California Supreme Court held that the evidence was properly admitted because the provisions of Evidence Code section 1151 do not apply in an action in which the defendant is alleged to be liable under the theory of "strict liability."

According to the court, "Section 1151 by its own terms excludes evidence of subsequent remedial or precautionary measures only when such evidence is offered to prove negligence or culpable conduct. In an action based upon strict liability against a manufacturer, negligence or culpability is not a necessary ingredient. The plaintiff may recover if he establishes that the product was defective, and he need not show that the defendants breached a duty of due care. [Citations.]" (13 Cal.3d at p. 118.)

The court gave short shrift to defendant's contention that by placing a defective product on the market it was "blameworthy in a moral sense, and . . . therefore guilty of 'culpable conduct' within the meaning of [Evidence Code] section 1151 . . . . It is difficult to escape a contrary conclusion: if the Legislature had intended to encompass cases involving strict liability within the ambit of section 1151, it would have used an expression less related to and consistent with affirmative fault than 'culpable conduct'—a term which, under defendant's theory, would embrace a moral rather than a legal duty." (13 Cal.3d at p. 118, fn. omitted.)

The court then noted that the history and intent behind the adoption of Evidence Code section 1151 required this conclusion. First, according to its drafters, the section was intended merely to codify "well-settled law" that subsequent repairs are simply irrelevant on the issue of a defendant's negli-

gence at the time of the injury. However, such repairs may come in under an exception to the general rule of exclusion if they occur closely in time to the injury, because "they may well illustrate the feasibility of the improvement at the time of the accident, one of the normal elements in the negligence calculus. (Citations.)" (13 Cal.3d at pp. 118-119.)

Second, the section was intended to promote remedial repairs and hence public safety, because the " 'admission of evidence of subsequent repairs *to prove negligence* would substantially discourage persons from making repairs after the occurrence of an accident.' " (13 Cal.3d at p. 119, quoting Law Revision Com. com. to Evid. Code, § 1151, italics in original.) The court reasoned that the admission of evidence of remediation in connection with a product liability action, however, would not deter subsequent product improvement changes, because it was unreasonable to believe that a manufacturer would forego making such improvements, thus risking innumerable additional lawsuits and the attendant adverse effect on its public image, simply because evidence of remedial action might be admitted in an action founded on strict liability. Therefore, because the public policy behind the enactment of Evidence Code section 1151, to encourage remedial action, would not be furthered by interpreting the section's language so as to make it applicable to actions based on a theory of strict products liability, the court held that the section's exclusionary rule should not be "gratuitously extended" to that field. (13 Cal.3d at p. 120.)

Finally, the court noted that interpreting Evidence Code section 1151 so as to exclude evidence of subsequent repairs in connection with actions premised on strict products liability actually might *preclude* recovery under such theory of liability, thus undercutting the public policy behind the theory, which was itself designed to ensure and encourage safety in marketed products.[7] (13 Cal.3d at pp. 120-121, fn. 4.) In other words, the court looked at the public policy behind the enactment of Evidence Code section 1151 and behind the creation of the doctrine of strict products liability, and then interpreted the language of Evidence Code section 1151 so as to further both public policies.

It is apparent from the above discussion of the actual holding in *Ault* and the considerations behind that holding that *Ault* is inapplicable here.

---

[7] As noted earlier in this opinion, allowing plaintiffs to use a strict product liability theory as a basis for recovery encourages product safety by allowing plaintiffs to show that a particular product was defective, i.e., unreasonably dangerous when used in the intended fashion, without having to prove that the defect was the result of negligence in the design or manufacturing process. One way of demonstrating that a product was "unreasonably" dangerous, of course, is to show that there was another and more reasonable way in which the product could have been designed. In turn, evidence of subsequent changes in the product's design or manufacture, if close enough in time to plaintiff's injury, would be relevant to show that there was, in fact, a more commercially reasonable design or method of manufacture.

First, the court's conclusion that negligence or culpability is not a necessary ingredient in an action based upon strict products liability against a manufacturer, and that a plaintiff need not show that the defendants breached a duty of due care to prevail in such an action, does not mean that placing a defective product on the market is not a "wrongful act" within the meaning of section 377. It simply means that a plaintiff need not *prove* negligence or culpability to recover damages, nothing more.

Second, the court's conclusion that placing a defective product on the market is not the equivalent of a morally blameworthy act cannot be interpreted as a conclusion that such an act is not the breach of a legal duty or as a conclusion that such an act is not "wrongful."[8]

Third, and most important, the *Ault* court's conclusion was based *on interpreting Evidence Code section 1151 in a way which comported with both the public policy behind Evidence Code section 1151 and the public policy behind the creation of the theory of strict products liability.* The public policy behind Evidence Code section 1151, to encourage subsequent repairs by freeing negligent defendants from the fear that such repairs may be used as

---

[8] There is analogous authority for the proposition that the term "wrongful act" means simply a "tortious act." For example, it has been held, in connection with the interpretation of that phrase as used in a bond written for a private security guard under Business and Professions Code sections 7545 and 7546, which allow recovery for persons injured by the "wilful, malicious or wrongful act" of the principal, that "wrongful act" does not mean an intentional act, as would be indicated by the accompanying words willful and malicious, but instead means "any act which in ordinary course would infringe upon the rights of another to his damage, except when done in the exercise of an equal or superior right [citation] [and that] [t]he phrase is broad enough to include a wrongful act or neglect. [Citation.]" *(Callum* v. *Hartford Acc. & Indem. Co.* (1960) 186 Cal.App.2d Supp. 885, 888 [337 P.2d 259].)

Specifically, the court in *Callum* explained, "It was the act of [the bonded private security guard in] shooting which allegedly injured plaintiff. His act may be wrongful because the *act* should not have occurred, or because the *act* was not accomplished with due care under the circumstances. Early American cases, dealing with injuries from wrongful shooting, procedurally were brought in trespass (assault and battery) for the act itself; while in later decisions the fashion changed toward emphasis of the omission to use due care, i.e., action on the case. Either is proper. [Citations.]" *(Callum* v. *Hartford Acc. & Indem. Co., supra,* 186 Cal.App.2d Supp. at p. 888, italics in original; cited in 86 A.L.R.3d 757n; see also *De Malherbe* v. *Intern. U. of Elevator Constructors* (1978) 449 F.Supp. 1335, 1343-1345, interpreting Code of Civil Procedure section 340, the statute of limitations for personal injury, and concluding that the term "wrongful act," as used in that section, applies to personal injury in which the nature of the *liability* sounds primarily in tort, and 43 Cal.L.Rev., *Notes and Recent Decisions: Warranty: Tort and Contract Characterization: Statutes of Limitations, supra,* at p. 551, footnotes omitted, citing *Willey* v. *Alaska Packers' Assn., supra,* 9 F.2d 937, affirmed 18 F.2d 8 (9th Cir. 1927); *Sterling Aluminum Products* v. *Shell Oil Co., supra,* 140 F.2d 801, cert. den., 322 U.S. 761 [88 L.Ed. 1588, 64 S.Ct. 1279] (1944), interpreting Code of Civil Procedure section 340's one-year statute of limitations to apply to personal injury actions premised on strict liability, which law review article was quoted in relevant part at footnote 5 of this opinion, *ante.*)

evidence of their earlier negligence, is not the same as the public policy behind section 377, to assure that survivors are compensated for their loss and to deter negligent or wrongful acts. The meaning of words used by the Legislature must be interpreted in light of the purpose behind the enactment, not in light of how courts have interpreted similar words in enactments which are designed to advance *different* public policies.

*Defendant's Remaining Argument That a Distributor of Used or Secondhand Machinery May Not Be Held Liable on a Theory of Strict Products Liability*

Defendant's motion for summary judgment was based not only on its arguments as to the meaning of the term "wrongful act," but also on its argument that a distributor of used or secondhand machinery could not be held liable on a theory of strict products liability.

Plaintiffs took the position, supported by evidence in connection with the motion for summary judgment, that defendant Hubbs had owned the Caterpillar 988A since 1973, that a shade canopy was in place on it at the time of the injury, that no roll cage was in place at that time, that the earthmover had been originally manufactured and sold without a roll cage, that defendant Hubbs had maintained and repaired the earthmover during the course of its ownership, that defendant Hubbs had negligently installed the shade canopy, that defendant Hubbs had negligently repaired the earthmover, and that the seat belts installed in the earthmover and maintained by defendant Hubbs were defective.

Based on these facts, plaintiffs argued that defendants were not "used machinery dealers" who are exempt from liability under the theory of strict products liability. We agree. The cases relied upon by defendant Hubbs, namely, *Wilkinson* v. *Hicks* (1981) 126 Cal.App.3d 515, 519 [179 Cal.Rptr. 5]; *LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 751 [176 Cal.Rptr. 224]; and *Tauber-Arons Auctioneers Co.* v. *Superior Court* (1980) 101 Cal.App.3d 268, 284 [161 Cal.Rptr. 789], all involve defendants who either sold used machinery without making any adjustments, repairs or modifications to such machinery (*Wilkinson, supra,* at p. 518; *LaRosa, supra,* at p. 748) or who simply acted as auctioneers of such machinery. (*Tauber-Arons Auctioneers Co., supra,* at p. 274.) Notably, the court in *Tauber-Arons Auctioneers Co.* specifically stated that it was not deciding whether the defendant there might be liable under the theory of strict products liability "if the defect proven is the result of subsequent modification, dilapidation or misuse." (*Id.,* at p. 284.)

Defendant Hubbs, in its motion for summary judgment, failed to produce any evidence that it was simply a dealer in used machinery, and that it was not responsible for any modification, dilapidation or misuse which would have rendered the Caterpillar 988A unreasonably unsafe for its intended use. It therefore was not entitled to summary judgment on this alternative ground.

## DISPOSITION

The writ prayed for is authorized to issue, and shall direct the trial court to vacate its order of May 11, 1990, and to enter a new and different order denying said motion as to plaintiffs' cause of action for strict products liability for the reasons expressed in this opinion. Plaintiffs are awarded their costs in connection with this proceeding, such costs to be determined by the trial court. (Code Civ. Proc., § 1027.)

Hollenhorst, Acting P. J., and Dabney, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied October 25, 1990.