[No. F023736. Fifth Dist. Jan. 9, 1996.]

DORA A. SMITH, Petitioner, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
GENERAL MOTORS CORPORATION, Real Party in Interest.

[No. F023864. Fifth Dist. Jan. 9, 1996.]

MICHAEL D. STEPHENS et al., Petitioners, v.
THE SUPERIOR COURT OF STANISLAUS COUNTY, Respondent;
GENERAL MOTORS CORPORATION, Real Party in Interest.

## COUNSEL

L. L. Mick McBee, Jr., Bernhard E. Bergesen III, Daniel B. Beck, Walkup, Melodia, Kelly & Echeverria, Ronald H. Wecht, Miles, Sears & Eanni, William J. Seiler and Douglas L. Gordon for Petitioners.

No appearance for Respondents.

Snell & Wilmer, Richard A. Derevan, Gerda M. Roy, Arthur P. Greenfield, Kirkland & Ellis, Jay P. Lefkowitz, Gerald Masoudi, Parichan, Remberg, Crossman & Harvey, Harold A. Parichan and Deborah A. Coe for Real Party in Interest.

## OPINION

**BUCKLEY, J.**—In this case, we are called upon to decide whether the full faith and credit clause of the United States Constitution requires California

courts to enforce a permanent injunction entered by a court in another state in unrelated proceedings which adversely affects petitioners' discovery rights. We answer in the negative. We hold that because the out-of-state injunction was obtained in a proceeding to which petitioners were not parties, and it violates fundamental California public policy, the full faith and credit clause does not compel its recognition in our courts.

## RELEVANT FACTS

1. *The accidents.*

On November 29, 1991, petitioner Dora A. Smith, her husband and two children were involved in a multiple vehicle collision. The 1980 Chevrolet Monza vehicle in which they were traveling burst into flames. Although Smith was severely injured, she survived the accident. However, her husband and two children were unable to exit the Monza and suffered fatal burns. Smith sued General Motors Corporation (GM), setting forth a cause of action for product liability alleging the Monza's fuel tank system had been defectively designed and manufactured.

On May 8, 1992, petitioners Robert and Michael D. Stephens were injured when the GM pickup truck in which they were traveling struck a utility pole and burst into flames. The Stephenses also filed suit against GM, likewise setting forth a cause of action for product liability alleging the truck was not crashworthy and its fuel tank system had been defectively designed and manufactured.

2. *Ronald Elwell and the Michigan injunction.*

Ronald Elwell's employment with GM began in 1959. From 1971 to 1987 he was assigned to GM's engineering analysis group (EA). One of the responsibilities of EA is to monitor and study "the performance of [GM] vehicles in the hands of GM customers, including specifically GM vehicles involved in collisions giving rise to products liability lawsuits." EA also serves "as an in-house litigation support staff of experts, assisting [GM's] lawyer's in the technical defense of product liability litigation." Elwell was one of the EA engineers "responsible for fuel system analysis and the defense of post-collision fire cases . . . with particular responsibility for the analysis and defense of pickup truck fuel systems." He testified for GM on numerous occasions in products liability lawsuits "in defense of the safety and crashworthiness" of the fuel systems of GM vehicles.

Employment disputes arose between Elwell and GM; in 1987, Elwell was placed on "unassigned" status. Subsequent to April 1, 1987, he "was retained

as an expert in various litigation matters by GM and others in the automotive industry." Between 1989 and 1991 Elwell and GM unsuccessfully attempted to resolve their disagreement.

On May 3, 1991, Elwell was deposed during pretrial proceedings in *General Motors Corp.* v. *Moseley* (1994) 213 Ga.App. 875 [447 S.E.2d 302], a products liability suit similar to those at issue here. His testimony differed markedly from that which he had given while employed by GM. Specifically, Elwell "criticized the performance of the GM pickup truck fuel system [as] inferior to that of its competitors."

On June 19, 1991, Elwell filed suit against GM in Wayne County Superior Court, Michigan, alleging he had been wrongfully terminated. Thereafter, on August 8, 1991, GM filed a counterclaim against Elwell in the Michigan court alleging he had breached his fiduciary duties and misappropriated confidential information.

On August 15, 1991, Elwell was deposed for a second time in the *Moseley* case. He brought five boxes of GM documents to the deposition. After the Georgia court telephonically ruled that GM had a right to review the documents before plaintiffs could have access to them, they were withdrawn by Elwell's attorney.

The Michigan court subsequently issued a preliminary injunction prohibiting Elwell "from consulting or discussing with or disclosing to any person any of [GM's] trade secrets confidential information or matters of attorney-client work product relating in any manner to the subject matter of any products liability litigation . . . ."

Elwell and GM subsequently settled the wrongful termination suit. They entered into a stipulation in which Elwell agreed to entry of a broadly worded permanent injunction which not only enjoined Elwell from disclosing any GM trade secret or confidential information and required him to return all GM documents in his possession, but which also prohibited him from: "testifying without the prior written consent of GM, either at deposition or trial, as an expert witness, or as a witness of any kind, and from consulting with attorneys or their agents in any litigation already filed or to be filed in the future, involving GM as an owner, seller, manufacturer and/or designer of the product(s) in issue." Thereupon, the Michigan court entered an order dismissing Elwell's complaint and granting "an agreed permanent injunction" containing the language quoted above (the Michigan injunction). No hearing was held and no evidence was offered other than the stipulation.

3.  *The motions to depose Elwell.*

In February 1995, Smith filed a motion in the Fresno County Superior Court seeking an order modifying the Michigan injunction to permit her to

depose Elwell and call him to testify as an expert witness at trial. Likewise, in April 1995, the Stephenses filed a motion in the Stanislaus County Superior Court for issuance of a commission to take the out-of-state deposition of Elwell.

Both motions were denied on the ground that the Michigan injunction must be given full faith and credit in California courts.

The instant petitions for writ of mandate followed. As both petitions involve identical issues, we have ordered them consolidated.

DISCUSSION

I.  *Writ relief is proper.*

■   While parties are generally limited to appellate review of most interim orders, pretrial writ relief is available in certain limited circumstances, summarized in *Omaha Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1266 [258 Cal.Rptr. 66]: "(1) the issue tendered in the writ petition is of widespread interest [citation] or presents a significant and novel constitutional issue [citation]; (2) the trial court's order deprived petitioner of an opportunity to present a substantial portion of his cause of action [citations]; (3) conflicting trial court interpretations of the law require a resolution of the conflict [citation]; (4) the trial court's order is both clearly erroneous as a matter of law and substantially prejudices petitioner's case [citations]; (5) the party seeking the writ lacks an adequate means, such as a direct appeal, by which to attain relief [citation]; and (6) the petitioner will suffer harm or prejudice in a manner that cannot be corrected on appeal [citations]. The extent to which these criteria apply depends on the facts and circumstances of the case." (209 Cal.App.3d at pp. 1273-1274.)  ■   As will be shown below, petitioners have successfully demonstrated the necessity of pretrial relief.

It is undisputed that the issue presented here is an important matter of first impression. Moreover, GM does not contest petitioners' assertion that the Michigan injunction has been the subject of conflicting rulings in California trial courts as well as numerous other courts throughout the nation. Hence, guidance on this point is necessary and will be a benefit in many cases. In *Oceanside Union School Dist.* v. *Superior Court* (1962) 58 Cal.2d 180, 185-186, footnote 4 [23 Cal.Rptr. 375, 373 P.2d 439], our Supreme Court found the presence of these two factors to be sufficient to justify "use of the writ." And the importance of the issue presented has been repeatedly deemed sufficient to justify writ review. (*Williamson* v. *Superior Court* (1978) 21

Cal.3d 829, 833 [148 Cal.Rptr. 39, 582 P.2d 126]; *Stermer* v. *Superior Court* (1993) 20 Cal.App.4th 777, 779-780, fn. 1 [24 Cal.Rptr.2d 577].)

Despite GM's protestations to the contrary, petitioners have also demonstrated they will suffer irreparable injury if writ review is denied and that they have no adequate remedy at law. The Stephenses provided two declarations of counsel[1] showing that Elwell is a crucial witness and the order precluding his testimony severely damages their case. Elwell is independent of GM and has comprehensive knowledge on postcollision fuel-fed fires and the "evolution, design and intended design decisions" of the subject vehicles. He also participated in efforts to reduce postcollision fires and consulted with individuals concerning postcollision fire safety. He has testified as an expert witness for GM and has consulted with others in the industry about the fuel systems at issue here. No other present or former GM employee has Elwell's depth and range of knowledge concerning these crucial subjects. GM did not effectively rebut these assertions. It is also important to note that GM's minimization of Elwell's importance is suspect in light of its Herculean efforts in numerous jurisdictions to prevent him from testifying. Thus, we conclude Elwell is an essential witness and the orders precluding his testimony effectively bar a substantial portion of petitioners' cases.

GM's related argument that petitioners have suffered no harm by the trial courts' rulings because Elwell's testimony would necessarily consist of privileged information and petitioners are not entitled to disclosure of such evidence is also without merit. This contention is premised on a mischaracterization of the stipulation and of the Michigan injunction. Because the Michigan injunction expressly prohibits the giving of *any testimony whatsoever*, it reaches far beyond a mere prohibition against dissemination of privileged information or GM trade secrets. Moreover, contrary to GM's representation, Elwell did not stipulate that it would be impossible for him to separate privileged information from unprivileged information. Rather, he merely stipulated it would be difficult for him to do so.

GM also did not show that all of Elwell's work activities were designed to assist counsel in trial preparation. For example, in an August 29, 1991, declaration, Maynard Timm, a GM staff attorney, declared that litigation support is one of EA's responsibilities. However, he also declared that EA staff members monitor and study the performance of GM vehicles, especially those involved in collisions later giving rise to products liability

---

[1] GM's evidentiary objections are without merit. The declarations of the Stephenses' attorney, Mick McBee, were not submitted below because the Stephenses were not required to show irreparable injury in the trial court. In McBee's second declaration, he provided adequate foundation to support its contents and those of the first declaration. Moreover, this second declaration alone provides sufficient facts to conclude petitioners would suffer irreparable damage were they forced to try the case without benefit of Elwell's testimony.

lawsuits. These functions are separate from the work department members perform as litigation support. In addition, since Elwell has previously testified in numerous other cases for GM and in the *Moseley* case, he has demonstrated an ability to give relevant, *unprivileged* testimony.

Finally, petitioners have shown they have no adequate remedy at law. In *Brown* v. *Superior Court* (1949) 34 Cal.2d 559 [212 P.2d 878], petitioner sought a writ overturning the trial court's denial of his motion to depose several witnesses. Our high court concluded that writ review was proper, writing, "Although such orders are, of course, reviewable by appeal from the final judgment, a party should not be required to proceed to trial without the benefits afforded by a deposition to which he is entitled, and it is well settled that *under such circumstances* the burden, expense and delay involved in a trial render an appeal from an eventual judgment an inadequate remedy." (34 Cal.2d at p. 562, italics added.)

For the many reasons expressed above, we deem pretrial review appropriate.[2] (*Barrett* v. *Superior Court* (1990) 222 Cal.App.3d 1176, 1183 [272 Cal.Rptr. 304].)

II. *The full faith and credit clause does not compel recognition of the injunction.*

██ Article IV, section 1, of the United States Constitution provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." Title 28 of the United States Code Annotated at section 1738 provides that the acts, records and judicial proceedings of any court in the United States shall have the same full faith and credit in the courts of every other state as they have in the state from which they are taken. This clause has been applied to permanent injunctions. (*Gouveia* v. *Tazbir* (7th Cir. 1994) 37 F.3d 295, 300-301; cf. *Valerio* v. *Boise Cascade Corp.* (1986) 177 Cal.App.3d 1212, 1222-1223 [223 Cal.Rptr. 592].)

██ The Supreme Court is the final arbiter of the proper reach of this clause and of the various exceptions thereto. (*Magnolia Petroleum Co.* v.

---

[2]We also reject GM's contention the Stephenses' petition is not timely because they had made a motion for disclosure of the Elwell documents 11 months earlier which was denied on full faith and credit grounds. The trial court explicitly stated at the hearing on this earlier motion that it would reserve consideration whether Elwell could be deposed to a later date and would not rule on this issue until a motion was presented to him requesting such discovery.

*Hunt* (1943) 320 U.S. 430, 438 [88 L.Ed. 149, 154-155, 64 S.Ct. 208, 150 A.L.R. 413].) Contrary to GM's claim, the high court has not always found that refusal to enforce an out-of-state equitable decree violates the Constitution. For example, in *Fall* v. *Eastin* (1909) 215 U.S. 1 [54 L.Ed. 65, 30 S.Ct. 3], the United States Supreme Court found the refusal to enforce a Washington decree purporting to convey title to a parcel of real property located in Nebraska did not offend the Constitution. (*Id.* at p. 14 [54 L.Ed. at pp. 71-72].) There, husband and wife purchased the disputed parcel while residing in Nebraska. They subsequently moved to Washington State. Husband filed for divorce. In its dissolution decree, the Washington court awarded the Nebraska parcel to wife. Thereafter, husband conveyed it to W. H. Fall. Wife filed suit in Nebraska against Fall to quiet title to the real property, arguing the full faith and credit clause mandated enforcement of the Washington decree. The Nebraska Supreme Court ruled in favor of Fall and the United States Supreme Court affirmed. The majority held that the decree itself was inoperative to affect title to the land. The Washington decree "gave no such equities as could be recognized" against third parties and the Nebraska court's declination to enforce the decree "does not offend the Constitution of the United States." (*Id.* at p. 14 [54 L.Ed. at p. 72].) In his concurring opinion, Justice Holmes pointed out ". . . the Nebraska court carefully avoids saying the decree would not be binding between the *original parties*, had the husband been before the court." (*Id.* at p. 15 [54 L.Ed. at p. 72], italics added.)

*Fall* is in certain respects analogous to the instant case. GM stands in the shoes of the wife, seeking enforcement of an out-of-state injunction against unrelated third parties who received no notice of the proceedings and who were not subject to that court's jurisdiction. ▪▪▪ A cause of action is a form of property. The Michigan injunction adversely affects petitioners' causes of action against GM by effectively destroying their ability to prove a substantial portion of their case. Just like the Nebraska real property, these causes of action are "situated" in California—having been filed in our courts. Neither the petitioners nor their causes of action were subject to the jurisdiction of the Michigan court. In fact, this case is even more compelling than *Fall* because the petitioners here are unquestionably innocent parties, whereas in *Fall* the purpose of the conveyance was to defeat the Washington decree, and it appears Fall was cognizant of the attendant circumstances.

▪▪▪ The United States Supreme Court has also repeatedly recognized that, except in the case of a money judgment in a civil suit, ". . . there are some limitations upon the extent to which a state may be required by the full faith and credit clause to enforce *even the judgment* of another state in contravention of its own statutes or policy." (*Pacific Ins. Co.* v. *Comm'n.*

(1939) 306 U.S. 493, 502 [83 L.Ed. 940, 945, 59 S.Ct. 629], italics added; *Alaska Packers Assn.* v. *Comm'n.* (1935) 294 U.S. 532, 546 [79 L.Ed. 1044, 1051-1052, 55 S.Ct. 518]; *Magnolia Petroleum Co.* v. *Hunt, supra,* 320 U.S. at p. 438 [88 L.Ed. at pp. 154-155] [overruled on another ground in *Thomas* v. *Washington Gas Light Co.* (1980) 448 U.S. 261, 286 [65 L.Ed.2d 757, 776, 100 S.Ct. 2647], but applicable principle reaffirmed in dissent at p. 295 (65 L.Ed.2d at p. 782)]; *United Bank of Denver* v. *K & Y Trucking Co.* (1983) 147 Cal.App.3d 217, 222 [195 Cal.Rptr. 49].)

This public policy exception "is implied from the nature of our dual system of government, and recognizes that consistently with the full faith and credit clause there may be limits to the extent to which the policy of one state, in many respects sovereign, may be subordinated to the policy of another." (*Milwaukee County* v. *White Co.* (1935) 296 U.S. 268, 273 [80 L.Ed. 220, 225-226, 56 S.Ct. 229].) Were there to be a "rigid and literal enforcement of the full faith and credit clause," without consideration of the applicable statutes or policies of the forum state, it "would lead to the absurd result that, wherever the conflict arises, the statute of each state must be enforced in the courts of the other, but cannot be in its own." (*Alaska Packers Assn.* v. *Comm'n., supra,* 294 U.S. at p. 547 [79 L.Ed. at p. 1052].) This conflict "is to be resolved, not by giving automatic effect to the full faith and credit clause, compelling the courts of each state to subordinate its own statutes to those of the other, but by appraising the governmental interests of each jurisdiction, and turning the scale of decision according to their weight." (*Ibid.*) "Full faith and credit does not . . . enable one state to legislate for the other or to project its laws across state lines so as to preclude the other from prescribing for itself the legal consequences of acts within it." (*Pacific Ins. Co.* v. *Comm'n., supra,* 306 U.S. at pp. 504-505 [83 L.Ed.2d at p. 946].)

Numerous California appellate courts have recognized this limited exception. (*Brinker* v. *Superior Court* (1991) 235 Cal.App.3d 1296, 1299 [1 Cal.Rptr.2d 358]; *United Bank of Denver* v. *K & Y Trucking Co., supra,* 147 Cal.App.3d at p. 222; *Silbrico Corp.* v. *Raanan* (1985) 170 Cal.App.3d 202, 208 [216 Cal.Rptr. 201].) As was explained in *Brinker* v. *Superior Court, supra,* 235 Cal.App.3d 1296, " 'It has long been the law that "the judgment of a state court should have the same credit, validity, and effect in every other court in the United States, which it had in the state where it was pronounced." ' [Citation.] ' "The rare exceptions to the application of the full faith and credit clause arise only when there is a violation of some fundamental state public policy . . . . . [T]here is no precedent for an exception in the case of a money judgment in a civil suit." ' [Citations.]" (235 Cal.App.3d at p. 1299.)

We reject GM's contention that no such public policy exception exists. This argument improperly fails to distinguish between civil money judgments and equitable remedies such as the permanent injunction at issue here. The cases GM cited in support of its argument, such as *Fauntleroy* v. *Lum* (1908) 210 U.S. 230 [52 L.Ed. 1039, 28 S.Ct. 641], refer to monetary judgments as being subject to enforcement regardless of contrary state policies. The Stephenses correctly explain that the difference arises from the fact that the underlying cause of action is merged into a money judgment but not merged into an equitable decree. And when an equitable decree is at issue, the very act or forbearance ordered by the decree may itself violate local laws or public policy in a way that a monetary judgment cannot. (Scoles & Hay, Conflict of Laws (2d ed. 1992) § 24.9, fn. 5, p. 965.)

Although its existence has repeatedly been affirmed, application of this doctrine is rare. However, its employment is necessary here. Not only were petitioners not parties to the Michigan proceedings, having no notice thereof or opportunity to contest issuance of the injunction, but this equitable decree blatantly and irreconcilably conflicts with our fundamental public policy against the suppression of evidence.

While we recognize the attorney-client and work-product privileges, "[a]greements to suppress evidence have long been held void as against public policy, both in California and in most common law jurisdictions." (*Williamson* v. *Superior Court, supra,* 21 Cal.3d 829, 836-837; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 611, p. 550; 6A Corbin on Contracts (1962) § 1430, p. 380.) The Legislature expressed its disapproval of such noxious agreements in the strongest way possible—by making it a felony to attempt by means of a bribe to dissuade a person from testifying in a judicial proceeding or to accept such a bribe. Penal Code section 138 was enacted in 1872 and is an offense against public justice. Subdivision (a) declares that every person who gives or offers or promises to give to any witness any bribe upon agreement that the person will not attend a trial or other judicial proceeding or attempts to do so is guilty of a felony.

Petitioners have repeatedly asserted GM purchased Elwell's agreement not to testify at any judicial proceeding. Although the record does not reveal the precise details of that agreement, it is noteworthy that GM has never denied this allegation, either in its briefs or at oral argument. We construe GM's silence as tacit acceptance of the truth of petitioners' assertion. Moreover, another court has already characterized the agreement as being bought. A strongly worded order of the United States District Court, Western District of Missouri, Western Division, declared that "G.M. bought Elwell's silence on any matters that could be damaging to G.M.'s interest.

Under the injunction, G.M. has not only prevented Elwell from speaking on his own behalf, but no one else may find out what he knows, effectively blockading a litigant's search for the truth and for redress."[3] (*Shoemaker* v. *General Motors* (W.D.Mo. 1993) No. 91-0990-CV-W-8).)[4]

As was explained *ante* in part I, despite GM's arguments to the contrary, the Michigan injunction encompasses more than the mere protection of privileged information and is significantly broader than the original preliminary injunction issued after judicial hearing. The preliminary injunction merely precluded Elwell from voluntarily disclosing GM trade secrets and other confidential information. In stark contrast, the Michigan injunction flatly prohibits Elwell from offering *any testimony whatsoever* without the prior written consent of GM. On its face, it extends far beyond matters which might legitimately constitute attorney work product or GM trade secrets.

We also explained *ante* in part I that Elwell is a crucial witness possessing unprivileged information concerning the design and performance of the fuel systems at issue here. The Michigan injunction, derived exclusively from a voluntary agreement between Elwell and GM, results in the suppression of highly relevant, discoverable evidence most probably very damaging to GM's position, as evidenced by the results in the *Moseley* case.[5]

The agreement and resulting injunction not only violate our fundamental public policy against suppression of evidence, but recognition of the injunction would undermine the fundamental integrity of this state's judicial system. We can imagine no stronger instance compelling application of the public policy exception to the full faith and credit clause. Therefore, reversal of the trial courts' orders violates no constitutional precepts.

We are not the first jurisdiction to draw this conclusion. In *Williams* v. *General Motors Corp.* (S.D.Ga. 1993) 147 F.R.D. 270, a federal district court declared that "by facially prohibiting Elwell from testifying as to matters outside the scope of any privilege, [the injunction] violates Georgia public policy. Therefore, the Full Faith and Credit Clause does not require this Court to give full effect to the Michigan court order." (147 F.R.D. at p. 272.)

Finally, in *Ex Parte Uppercu* (1915) 239 U.S. 435 [60 L.Ed. 368, 36 S.Ct. 140], the United States Supreme Court stressed that fundamental notions of

---

[3]Although this order was unpublished, it is part of the record of the instant proceedings; GM raised no evidentiary objections to its inclusion therein.

[4]Even if his silence were not "purchased," the resultant suppression of evidence would be inimical to our fundamental state public policy. (Cf. *Williamson* v. *Superior Court, supra,* 21 Cal.3d at pp. 836-837.)

[5]The jury returned a $105 million verdict against GM which was overturned on appeal. (*General Motors Corp.* v. *Moseley, supra,* 447 S.E.2d 302.)

fairness cannot be ignored in making discovery orders. In a prior case to which petitioner was not a party the court had sealed all papers, including depositions, and had made the depositions unavailable for evidence in other cases. Petitioner sought the depositions to support a claim in an unrelated proceeding against one of the parties to the prior case. Any right petitioner had to examine the records in question was suspended by the ensealing order. Petitioner moved for a right to inspect the depositions. The motion was denied; however, the Supreme Court reversed, declaring the earlier order was an unconscionable excess of the lower court's power. (*Fisher* v. *Delehant* (8th Cir. 1957) 250 F.2d 265, 269.) Writing for a unanimous court, Justice Holmes declared:

"The necessities of litigation and the requirements of justice found a new right of a wholly different kind. So long as the object physically exists, anyone needing it as evidence at a trial has a right to call for it, . . . Neither the parties to the original cause nor the deponents have any privilege, and the mere unwillingness of an unprivileged person to have the evidence used cannot be strengthened by such a judicial fiat as this, forbidding it, however proper and effective the sealing may have been against the public at large. . . .

". . . As against the petitioner the order has no judicial character, but is simply an unauthorized exclusion of him by virtue of *de facto* power." (239 U.S. at pp. 440-441 [60 L.Ed. at p. 372].)

The principle expressed in *Ex Parte Uppercu* is directly applicable here. The Michigan court had no jurisdiction over the petitioners, who had neither notice of nor opportunity to contest the issuance of the injunction, a decree obtained as a result of a purchased settlement in a completely unrelated case. Enforcement of the injunction would substantially impair the right of petitioners and others similarly situated to full acquisition of evidence necessary to prosecute their claims against GM without any possible legal redress. Just as in *Uppercu*, enforcement of the injunction against unrelated third parties who are not even remotely connected with the employment dispute between Elwell and GM would constitute acquiescence to an unauthorized exercise of de facto power. Bedrock constitutional principles mandating procedural fairness preclude such a result.

For all these reasons, we hold that the Michigan injunction is not enforceable in California, and the courts erred in denying the motions brought by petitioners.[6]

We express no opinion on whether the Fresno County Superior Court had jurisdiction to *modify* the Michigan injunction. Since the only purpose of the requested modification was to permit the taking of Elwell's deposition and his appearance as a witness, our opinion essentially grants the relief sought by petitioner.

## DISPOSITION

In each of the two cases (Fresno County Superior Court No. 454255-1 and Stanislaus County Superior Court No. 303305), the court is directed to vacate its order denying petitioners' motion to take the deposition of Ronald Elwell and enter a new order permitting the same. Costs are awarded to petitioners in their respective actions.

Dibiaso, Acting P. J., and Thaxter, J., concurred.

A petition for a rehearing was denied February 5, 1996, and the petition of real party in interest for review by the Supreme Court was denied April 18, 1996.

---

[6]As was explained in *Williams* v. *General Motors Corp.*, *supra*, 147 F.R.D. 270, we do "not presuppose that the questions [petitioners] desire to pose to Mr. Elwell will go into privileged areas. . . . If Elwell's answer to a specific question actually posed in deposition would violate a privilege or constitute misappropriation of a trade secret, then GM may raise a specific objection during the deposition. GM is cautioned that any objections must be made in good faith, and the burden lies with GM to establish that the specific matters are indeed subject to privilege or protection." (*Id.* at p. 273.)