[No. H034441. Sixth Dist. Dec. 29, 2009.]

JASMINE NETWORKS, INC., Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
MARVELL SEMICONDUCTOR, INC., et al., Real Parties in Interest.

984

**COUNSEL**

Trepel Law Firm, Anthony J. Trepel; McGrane Greenfield, William McGrane, Christopher Sullivan, Maureen Harrington; Greines, Martin, Stein & Richland, Robin Meadow, Marc J. Poster and Alana H. Rotter for Petitioner.

No appearance for Respondent.

Latham & Watkins, Steven M. Bauer, Charles Crompton, James K. Lynch; Cooke Kobrick & Wu, Steven S. Wu, Christopher C. Cooke and Jeffrey W. Kobrick for Real Parties in Interest.

## OPINION

**RUSHING, P. J.**—Plaintiff Jasmine Networks, Inc. (Jasmine), brought this action charging Marvell Semiconductor, Inc. (Marvell), and others with violating California's Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) (CUTSA) by misappropriating certain trade secrets belonging to Jasmine. Not long after filing the action Jasmine went through bankruptcy proceedings, in the course of which it sold its rights in the alleged trade secrets, while reserving its rights of action for misappropriation commencing before the date of the transfer. As this lawsuit reached the verge of trial, Marvell moved to dismiss Jasmine's complaint on the ground that by selling the alleged secrets, Jasmine had forfeited its "standing" to maintain an action for misappropriation. Marvell asserted the existence of a "current ownership rule," under which a plaintiff can recover for misappropriation of a trade secret only if he owns the trade secret at the time of suit. The trial court found this argument persuasive, and dismissed Jasmine's complaint.

■ Jasmine petitioned this court for a writ of mandate directing the trial court to set aside its order of dismissal and permit the matter to proceed to trial. We issued an order to show cause why the petition should not be granted. We will now grant the requested relief. Despite the impressive efforts by Marvell's counsel to conjure up a "current ownership rule," we find no support for such a rule in the text of the CUTSA, cases applying it, or legislative history. Nor do we find any evidence of such a rule in patent or copyright law, which defendants have cited by analogy. Defendants have offered no persuasive argument from policy for our adoption of such a rule. There may be situations where a suit by a former owner raises concerns about the rights of absent parties, or a risk of multiple or inconsistent liabilities on the part of parties before the court, but the remedy for such concerns lies in our liberal and highly flexible procedures for the permissive or compulsory joinder of parties. There is in short no substantial basis for the argument put forward by defendants, and the trial court erred by dismissing the complaint.

### BACKGROUND

Jasmine originally sued 12 defendants, but by the time the matter came on for trial, only three remained: Marvell and two former Jasmine managers, Richard Sowell and Patrick J. Murphy. Jasmine alleged in its second amended complaint that commencing in April 2001, Marvell had sought to negotiate, under a mutual confidentiality agreement, the right to use certain technology developed by Jasmine involving application-specific integrated circuits (ASIC's) and packet fabric switching. In May 2001, Marvell offered $40 million to acquire Jasmine's entire ASIC development group, including the

fabric switching technology. According to Jasmine, however, even as negotiations were proceeding, Marvell was acquiring much or all of the technology it sought by wrongful means, including from information provided under the nondisclosure agreement, and from Jasmine employees, including defendants Sowell and Murphy, whom Marvell induced to breach their fiduciary and contractual obligations to Jasmine. By late August 2001, Jasmine alleged, Marvell had obtained substantially all of the value of Jasmine's ASIC group. Around that time it offered Jasmine $15 million for it.

Jasmine brought this action on September 12, 2001. By the time of trial the following causes of action remained: misappropriation of trade secrets, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful interference with contract and economic advantage, and unfair business practices. Marvell cross-complained, charging Jasmine with, among other things, fraud, in that the technology it had offered to Marvell was actually purloined from a third party and that Jasmine had itself breached their disclosure agreement by wrongfully disclosing confidential information provided to it by Marvell. Sowell and Murphy also cross-complained, charging Jasmine with slander and violations of wage laws.

In August 2002, Jasmine filed for protection under chapter 11 of the bankruptcy laws. In December 2002, Jasmine proposed to the bankruptcy court that it sell substantially all of its assets, reserving only the claims in this action, which it explicitly intended to pursue. The proposal identified these claims as Jasmine's most valuable asset. It also contemplated the sale of "Jasmine's Optical Networking Business, including its ASIC Products," to an entity named Teradiant Networks, Inc. (Teradiant), for the sum of $300,000. Marvell requested notice of all bankruptcy proceedings, and appeared by counsel at the hearing on the proposed disposition of assets. No one objected to the proposal. On December 5, 2002, the bankruptcy court approved it. Under the terms of the agreement, the transfer of assets occurred on or before December 31, 2002.

This matter proceeded to the verge of trial. On May 21, 2009, in preparatory discussions in open court, counsel for Marvell stated, "There is a defense here that puts an end to the whole case . . . . It's called standing." He acknowledged that this "defense" had not been raised earlier by summary judgment or other dispositive motion, but said it could be raised "at any time."[1] He went on to assert that the pattern jury instructions for misappropriation of trade secrets "say you must either be an owner or a licensee of the intellectual property that you're suing on." (See p. 997, *post.*) Having sold all

---

[1] This was apparently Marvell's first reference to such a defense, which it had mentioned nowhere in the trial brief prepared about three weeks before these remarks.

of its intellectual property to Teradiant, he contended, Jasmine could not satisfy this requirement, despite having "held on" to the cause of action it asserted here.

Five days later Marvell submitted a written motion "for an order dismissing Jasmine Networks, Inc.'s Second Amended Complaint due to lack of standing."[2] Sowell and Murphy joined in the motion. Jasmine opposed the motion both on the grounds that there was no such rule, and that the bankruptcy court's rulings were conclusive on the issue of its standing. The court heard the motion on May 29, and on June 5 issued a formal order dismissing the complaint with prejudice. Finding the question to be one of first impression, the court wrote, "[A] former owner of a trade secret lacks the requisite property interests and rights that trade secret law seeks to protect. Although there are persuasive arguments and legitimate equities on both sides of this issue, it is the Court's opinion a former owner lacks the necessary standing to sue for the misappropriation of property that it no longer owns because the former owner no longer has a protectable interest in the property."

Jasmine petitioned this court for a writ directing the trial to reverse its order of dismissal, and for a stay of defendants' pending cross-actions against it. We issued the requested stay and an order to show cause.

## DISCUSSION

### I. *Conditions for Extraordinary Relief; Standard of Review*

Our issuance of an order to show cause rested on our determination that plaintiff had no "plain, speedy, and adequate remedy" for the dismissal of its action "in the ordinary course of law" (Code Civ. Proc., § 1086; see *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1056 [134 Cal.Rptr.2d 358]) and that, if its contentions were correct, it would suffer irreparable injury in the absence of extraordinary relief (*Smith v. Superior Court* (1996) 41 Cal.App.4th 1014, 1020–1021 [49 Cal.Rptr.2d 20]). Plaintiff could of course have obtained review of that order on direct appeal from an eventual

---

[2] In form the motion most nearly resembled the former "speaking motion to dismiss," which never had any foundation in statute, and was abolished half a century ago. (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, §§ 1004–1006, pp. 412–418; *Pianka v. State* (1956) 46 Cal.2d 208, 211 [293 P.2d 458].) A more viable procedure might have been to raise the point by motion for *judgment on the pleadings*, assuming the predicate fact—the transfer of intellectual property to Teradiant—could properly have been made the subject of judicial notice. (See Code Civ. Proc., § 438; Evid. Code, § 452, subds. (c), (d); 5 Witkin, *supra*, Pleading, § 1002(1), p. 411; see 5 Witkin, *supra*, § 1002(2), p. 411 [motion to exclude all evidence because no cause of action pled].) We need not wrestle with these procedural questions, however, because we have concluded that the motion was entirely without substantive merit.

judgment, but in the meantime the trial court was poised to proceed with a trial of defendants' cross-actions against plaintiff. This exposed all participants to the risk of two trials if we concluded, as it appeared to us we were likely to do, that the dismissal of the complaint was erroneous. The requisite urgency is commonly found where, as here, the trial court has effectively disposed of *part* of an action, leaving the rest for trial, and there is a substantial likelihood that the partial disposition may be held on appeal to constitute error, necessitating a second trial, whereas timely appellate intervention by extraordinary writ would permit the entire case to be disposed of in a single trial. (See, e.g., *Coulter v. Superior Court* (1978) 21 Cal.3d 144, 148 [145 Cal.Rptr. 534, 577 P.2d 669] [demurrer sustained to less than all causes of action; writ appropriate to "prevent a needless and expensive trial and reversal"]; *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1183 [272 Cal.Rptr. 304] [summary adjudication disposing of one but not all theories of liability; "were plaintiffs not to prevail on their other two theories, and were the order here under review determined to have been incorrect, then a second trial would be required, with the attendant waste of judicial resources"]; *Lopez v. Superior Court* (1996) 45 Cal.App.4th 705, 710, fn. 1 [52 Cal.Rptr.2d 821] [summary judgment in favor of one defendant, with trial pending against other].)

The order under review is based upon the trial court's determination that plaintiff was unable to maintain a cause of action for misappropriation of a trade secret because, as plaintiff conceded, it had sold its rights in the underlying trade secret to a third party. The question thus presented is whether one who claims to have been injured by the misappropriation of a trade secret can retain a right of action on that injury after he has divested himself of any present interest in the underlying secret. This is a pure question of law, which we address without deference to the trial court's ruling. (See *In re K.F.* (2009) 173 Cal.App.4th 655, 661 [92 Cal.Rptr.3d 784]; *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 558 [66 Cal.Rptr.3d 1].)

## II. *"Standing"*

Defendants contend that a trade secret plaintiff must "currently own" the secret in order to maintain an action for damage resulting from its misappropriation.[3] Although they couch their argument in terms of plaintiff's supposed

---

[3] Among the troublesome details defendants have managed to ignore is *exactly when* this ownership requirement applies. Here Jasmine still owned the intellectual property at issue in September 2001, when it brought this action. The bankruptcy court did not approve the sale of that asset until December 2002. The suggestion that plaintiff nonetheless lacks "standing" therefore necessarily assumes that the posited requirement extends beyond the date of filing suit to some later event.

lack of "standing" to maintain this action, we do not believe that characterization adds anything to—indeed it obscures—the real substance of the argument.

■ Properly understood, the concept of "standing" contemplates a requirement that the plaintiff "establish an entitlement to judicial action, *separate from proof of the substantive merits* of the claim advanced." (13A Wright et al., Fed. Practice and Procedure (3d ed. 2008) § 3531, p. 6, italics added.) This concept "has been largely a creature of twentieth century decisions of the federal courts." (*Ibid.*, fn. omitted.) It is rooted in the *constitutionally limited subject matter jurisdiction* of those courts. (See *id.* at p. 9 ["The threshold requirements are attributed to the 'case' and 'controversy' terms that define the federal judicial power in Article III. Absent constitutional standing, *the courts believe they lack power to entertain the proceeding.*" (italics added)]; see 13 Wright et al., *supra*, § 3522, pp. 103–104 [presumption that federal court lacks subject matter jurisdiction].) But as our Supreme Court has written, no such wariness surrounds the subject matter jurisdiction of California courts: "Article III of the federal Constitution imposes a 'case-or-controversy limitation on federal court jurisdiction,' requiring ' "the party requesting standing [to allege] 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.' " ' [Citation.] There is no similar requirement in our state Constitution. [Citation.]" (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1117, fn. 13 [72 Cal.Rptr.3d 129, 175 P.3d 1184]; see Cal. Const., art. VI, § 10 [empowering superior court to adjudicate any "cause" brought before it]; *National Paint & Coatings Assn. v. State of California* (1997) 58 Cal.App.4th 753, 761 [68 Cal.Rptr.2d 360] [rejecting claimed standing requirement based on federal citations; Cal. Const. "contains no 'case or controversy' requirement"]; *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 29 [112 Cal.Rptr.2d 5] [following *National Paint*].)

Even in the federal courts the notion of "standing" is nebulous, its application controversial. "The term started out as a nonspecific metaphor, gained currency in equity, and only later became a constitutional doctrine." (Winter, *The Metaphor of Standing and the Problem of Self-Governance* (1988) 40 Stan. L.Rev. 1371, 1417 (*Metaphor*).) Its early usage was largely in reference to the plaintiff's entitlement to *relief*, particularly in proceedings *in equity*, which were in those days constrained by many factors, some of which reflected the highly artificial separation between proceedings in equity and actions at law. (*Id.* at pp. 1422–1424.) Although these limitations were sometimes described as *jurisdictional*, some of the best legal minds criticized such a view. (*Id.* at p. 1425, quoting *Mass. State Grange v. Benton* (1926) 272 U.S. 525, 528 [71 L.Ed. 387, 47 S.Ct. 189] (opn. of Holmes, J.) [" 'Courts sometimes say that there is no jurisdiction in equity when they mean only

that equity ought not to give the relief asked.' "].) The metaphor of "standing" nonetheless exerted an "overpowering" influence on the judicial mind: " 'A standing in court' sounds like a question of jurisdiction because standing up is a prerequisite to being heard in court. Justice Holmes, Pomeroy, and the Supreme Court did battle with the metaphor, but lost. 'Standing' became a question of jurisdiction in the more fundamental sense of justiciability under article III." (*Metaphor, supra,* 40 Stan. L.Rev. at p. 1425, italics omitted.)

■ Defendants suggest that a "standing" requirement arises in California courts by virtue of Code of Civil Procedure section 367 (section 367), which states that except as otherwise provided by statute, every action "must be prosecuted in the name of the real party in interest." This provision is not the equivalent of, and provides no occasion to import, federal-style "standing" requirements. Again, the federal doctrine requires plaintiffs—or some of them—to "establish an entitlement to judicial action, *separate from proof of the substantive merits* of the claim advanced."[4] (13A Wright et al., Fed. Practice and Procedure, *supra,* § 3531, p. 6, italics added.) In contrast, section 367 simply requires that the action be maintained *in the name of* "[t]he person who has the right to sue *under the substantive law.*" (4 Witkin, Cal. Procedure, *supra,* Pleading, § 121, p. 187, italics added.) Thus if the plaintiff has a cause of action in his own right, and he pursues it in his own name, section 367 poses no obstacle to maintenance of the action. The application of the statute, "while superficially concerned with procedural rules, really calls for a consideration of rights and obligations." (4 Witkin, *supra,* Pleading, § 121, p. 187.)

■ The term "standing" may have some utility when a plaintiff attempts to assert *the rights of third parties.* This problem, sometimes referred to as *jus tertii,* is not confined to plaintiffs; it may also arise when one seeks to defeat a claim by asserting the paramount rights of a third person. (See *Wetherly v. Straus* (1892) 93 Cal. 283, 287 [28 P. 1045] ["A bailee can assert a *jus tertii* in an action by the bailor only when he defends on such title, and by the authority of such third person."]; *Johnson v. Department of Social Services* (1981) 123 Cal.App.3d 878, 883 [177 Cal.Rptr. 49] [vicarious assertion by daycare center operators of parents' alleged rights to permit corporal discipline described as "*jus tertii*"]; *Johnson,* at p. 883, fn. 2, citing Comment,

---

[4] The authors of the cited treatise go on to acknowledge that federal courts have invoked "standing" to cover a number of other subjects, including "the existence of a cause of action, capacity, intervention, and even the procedural rights of bankrupts." (13A Wright et al., Fed. Practice and Procedure, *supra,* § 3531, p. 9.) The chief significance of this fact, however, may be its tendency to show the subliminal potency of the "standing" metaphor. Not all metaphors, of course, are pernicious. A metaphor can provide a valuable means of stripping away preconceptions and showing a subject in a new and useful light. The danger is that a particular metaphor may carry baggage giving it a dangerous tendency to draw attention away from sound substance and policy.

*Standing to Assert Constitutional Jus Tertii* (1974) 88 Harv. L.Rev. 423, 431–436; *Endler v. Schutzbank* (1968) 68 Cal.2d 162, 175, fn. 9 [65 Cal.Rptr. 297, 436 P.2d 297] [acknowledging " 'third-party' problem" of "when A may challenge B's action on the ground that it infringes a right of C"].) Indeed the problem is not confined to civil litigation. In criminal cases we speak of the defendant's "standing" to suppress evidence based upon a violation of constitutional rights arguably not his own. (See, e.g., *People v. Superior Court (Walker)* (2006) 143 Cal.App.4th 1183, 1196 [49 Cal.Rptr.3d 831].)

■ The rule of section 367 would indeed seem to be implicated by any true case of *jus tertii*, for if the plaintiff is asserting *only* the rights of another, he is presumably not the real party in interest. Again, however, the fundamental weakness in his case is his own lack of a right of action. If not for that deficiency, his attempt to assert the rights of others would go only to the question of *remedy*. It is only when he seeks to assert the rights of others *instead of* his own that the question may properly arise whether his action is barred by a lack of "standing." Even in that circumstance it is presumably within the power of the Legislature to grant him a right to sue for the benefit of others, i.e., to make him a real party in interest. In such a case it might justly be said that it has granted him "standing."

Apparently, however, by a kind of reverse analogy from this usage, as well as a kind of osmotic absorption of federal law, some cases have extended the term "standing" to situations where, if the rights being asserted exist at all, they are the plaintiff's. But this use of the term often if not always obscures the real question in those cases, which is whether the plaintiff has pled, or can prove, one or more *elements of his cause of action*—typically the breach of a duty owed to him, or consequent damages sustained by him.[5] (See, e.g., *Keru Investments, Inc. v. Cube Co.* (1998) 63 Cal.App.4th 1412, 1420, 1424–1425 [74 Cal.Rptr.2d 744] [defendant contractor owed no duty of care to holder of deed of trust and may have owed no duty to purchaser; in any event purchaser suffered no cognizable damage]; *Krusi v. S.J. Amoroso Construction Co.* (2000) 81 Cal.App.4th 995, 999 [97 Cal.Rptr.2d 294] [trial court characterized issue as " 'standing,' " but it was "probably more properly phrased as when a cause of action for design or construction defects accrues

---

[5] One exception arises from the 2004 initiative amending the Unfair Practices Act to explicitly incorporate the requirement of "injury in fact" (Bus. & Prof. Code, § 17204) as applied "under the standing requirements of the United States Constitution" (Prop. 64, as approved by voters, Gen. Elec. (Nov. 2, 2004)). Not surprisingly, cases applying that requirement liberally employ the term "standing" to describe it, and rely freely on federal precedents in its application. (See, e.g., *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1344–1347 [90 Cal.Rptr.3d 589]; see also *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227 [46 Cal.Rptr.3d 57, 138 P.3d 207]; *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 812–813 [66 Cal.Rptr.3d 543].) The propriety of that approach, however, derives from the peculiar prescriptive origins of the requirement.

and who then owns it—or, as applied here, who doesn't own it" (italics omitted)].) The term is sometimes used in an arguably narrower sense to describe some particular *substantive condition* imposed by the Legislature on a statutory cause of action. An example of this usage is *Grosset v. Wenaas, supra,* 42 Cal.4th 1100, 1109–1110, which adopted the Delaware courts' characterization of a "continuous ownership" requirement in securities litigation as a rule of "standing." But even to describe something like a "continuous ownership" rule as a matter of "standing" raises the troubling question of why similar, more familiar conditions of suit, such as the statute of limitations, are not characterized likewise. In the courts of this state, such conditions on suit possess no special qualities. They are not jurisdictional, as evidenced by the fact that they can be forfeited by a defendant who fails to seasonably assert them. (See 3 Witkin, Cal. Procedure, *supra,* Actions, § 440, p. 560.) We question the utility of cloaking them in the quasi-jurisdictional mantle of "standing." At least one federal court has shared our reservations. (*Von Brimer v. Whirlpool Corp.* (9th Cir. 1976) 536 F.2d 838, 841, fn. 1 [question whether plaintiff had " 'proprietary interest' " in patent was properly considered not as going to "standing" but to "whether the person who brings the suit is a person harmed by the alleged wrong"].) We therefore view the question presented as an ordinary matter of substantive law, i.e., does the owner of an alleged trade secret lose the right to bring an action for its misappropriation if, after the alleged misappropriation occurs, he sells his remaining interest in the secret to a third party? We turn now to that question.

III. *A Current Ownership Requirement Is Not Supported by General Principles of Property or Tort Law*

One whose property has been wrongfully damaged by another does not lose the right to recover for that damage merely because he has sold the property at the time of suit. Anyone whose vehicle has been severely damaged by the negligent driving of another would be astonished to learn that in order to recover for the car's loss in value, he must keep it, and that by selling it for scrap, he would forfeit any such claim. It is the owner at the time of the injury who will ordinarily suffer the loss of value or cost of replacement or repair, and who will thus need the compensatory remedy that the law offers.

General authority squarely on point is scarce, but the principle is recognized, if slightly obscured by references to "standing," in *Vaughn v. Dame Construction Co.* (1990) 223 Cal.App.3d 144 [272 Cal.Rptr. 261] (*Vaughn*). There a builder who had been sued for construction defects moved for summary judgment on the ground that the plaintiff had lost the right to sue by selling the building after filing the suit. The trial court granted the motion, apparently concluding that the plaintiff was no longer the real party in

interest. The reviewing court reversed. The case, wrote the court, presented "a pure question of law, to wit, whether a real party in interest somehow loses standing to sue for damages suffered as a result of defective construction by the subsequent sale of the defective premises." (*Id.* at p. 146.) The defendant asserted that the plaintiff could "no longer . . . recover for her damages because she no longer owns the property," but cited only cases applying "the long-standing rule that one who is not the owner of the property *and was not damaged* cannot sue for injury to property." (*Id.* at p. 147, italics added.) This rule was inapplicable because the plaintiff *had* owned the property at the time of the injury and *had* been damaged. Nor did the court find any reason to suppose that the right to sue had automatically passed to the purchaser with title to the damaged property. (*Id.* at p. 148.) It was not an interest *in the real property*, analogous to a covenant running with the land, but a distinct form of *personal* property in its own right. (*Ibid.*) As a distinct property right, it could be held back by the plaintiff in a sale of the injured property. (*Id.* at p. 149.) Nor was the posited rule justified by the desirability of "protect[ing] a defendant from a multiplicity of suits and the further annoyance and vexation at the hands of other claimants *to the same demand.*" (*Id.* at p. 149, original italics.) The transferees had reportedly "bought the property with full knowledge of the defective construction," and had "presumably paid no more than the fair market value of the property in its defective condition." (*Ibid.*) This left "little likelihood that the new owners would or could assert the same claim as plaintiff." (*Ibid.*, fn. omitted.) Accordingly, the sale posed no impediment to the plaintiff's cause of action.

■ In the wake of *Vaughn* a number of cases have dealt with questions concerning the right of a *subsequent* owner to maintain an action for damage done to a building *before* he acquired it. (E.g., *Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1139 [46 Cal.Rptr.3d 804] [rejecting insurer's challenge to claim by homeowners association resting on premise that "no one can sue for property damage other than the party that owns the property at the time the damage occurs"]; *Keru Investments, Inc. v. Cube Co., supra,* 63 Cal.App.4th 1412, 1424 [extending *Vaughn* to hold "that the cause of action for negligent construction . . . was held by the [owner when it was done] and not the party to whom it transferred the property after the cause of action accrued"]; *Krusi v. S.J. Amoroso Construction Co., supra,* 81 Cal.App.4th 995, 1005–1008 [following *Keru*; holding that cause of action vested exclusively in owner of building at time of accrual]; *Siegel v. Anderson Homes, Inc.* (2004) 118 Cal.App.4th 994, 996 [13 Cal.Rptr.3d 462] ["absent proof [that] the original owners suffered actual economic injuries as a result of the construction defects . . . , they possessed no causes of action against [the defendant] that precluded [the

subsequent owners] from maintaining their present claims"].) While we question the approach in these cases to some extent, as discussed below, none of them casts the slightest doubt on the central premise that a right of action for damage to property is distinct from the title to the property, and from any right in the property, and that the transfer of the latter does not by itself effect a transfer or diminution of the former.

We do take some exception to these cases insofar as they rest implicitly or explicitly on an unspoken premise that as between a past and present owner, one or the other, but not both, can be a real party in interest for purposes of section 367 in any suit for damage to the property. Such a rule seems far removed from the original purpose of that statute, which was to facilitate, as part of the abolition of forms of action (and the consequent unification of law and equity) the free assignment of causes of action (Civ. Code, § 954), while saving to the defendant most of the defenses he would have against the assignor (Code Civ. Proc., § 368). As Witkin explained, "In the early common law courts, only the owner of the legal right could sue, and the assignee of a chose in action, whose right was not recognized at law, had to proceed in equity. A major purpose of the Code of Civil Procedure was to change that practice and enable the assignee to sue in his or her own name. The doctrine of the equity courts, that the person having the right should be entitled to the remedy, was accordingly adopted as the basis of the real party in interest statute. [Citations.]" (4 Witkin, Cal. Procedure, *supra*, Pleading, § 120, p. 186, italics added.)

In other words, section 367 sweeps away one of the complexities that would otherwise attend suits based on assigned causes of action. It bears only incidentally on the concern that seems to underlie the foregoing cases, which is the risk of multiple or inconsistent liability. That concern should (and does) pervade our law of procedure, but it is not the central focus of section 367. Rather, concerns about multiple or inconsistent liability are comprehensively addressed by a number of other statutes creating a variety of procedures designed to deal with precisely that risk. Thus the plaintiff may bring about the joinder of any other potential claimant, involuntarily if necessary. (See Code Civ. Proc., §§ 378, 382.) The absent claimant may seek to intervene (Code Civ. Proc., § 387) or to be joined by order (*id.*, § 389.5). If competing claimants have filed separate suits, any party may seek their consolidation (Code Civ. Proc., § 1048, subd. (a)) or coordination (Code Civ. Proc., § 404 et seq.). If potential claimants do not come forward on their own, their joinder may be compelled. (Code Civ. Proc., § 389.) If the defendant fails to act, the court has the power, and perhaps the duty, to require the joinder of a necessary party. (See *ibid.*; *Bank of Orient v. Superior Court* (1977) 67 Cal.App.3d 588, 595 [136 Cal.Rptr. 741]; *Bank of California v. Superior Court*

(1940) 16 Cal.2d 516, 522 [106 P.2d 879].) If the defendant concedes his duty to pay a sum of money, but fears conflicting demands by rival claimants, he may invoke the procedure of interpleader, which if sustained will permit him to pay the disputed sums into court and wash his hands of the controversy. (Code Civ. Proc., § 386.) He may be able to bring, in addition to or in lieu of these remedies, a cross-action against absent claimants seeking a declaration of their interests, or lack of same, in the subject matter. (See Code Civ. Proc., §§ 428.10, 1060.)

■ Far from viewing rival claims as obstacles to the plaintiff's action, our law reflects a strong preference for bringing all genuinely interested parties into a single proceeding and adjudicating all of the affected rights and liabilities at once. Indeed, the law prescribes dismissal—without prejudice— only where an interested party, who *cannot be joined*, is found to be *indispensable*. (Code Civ. Proc., § 389, subd. (b).) Even then the court must first consider, among other prescribed factors, "the extent to which, by protective provisions in the judgment, . . . or other measures" the risk of prejudice to parties before the court, or to the absent party, "can be lessened or avoided." (*Id.*, § 389, subd. (b)(2).)

Given this elaborate regime for addressing such situations, we doubt that a defendant's professed concern about potentially duplicative or inconsistent obligations should have *any bearing whatever* on a plaintiff's status as a "real party in interest" under section 367. The plaintiff either has a cause of action under the facts alleged in the complaint or he does not. If he does, the posited assertion of some competing or conflicting right by an absent party raises three questions: (1) Should that person be joined in the action? (2) If so, *can* he be joined in the action? And (3) if he cannot be joined, does his absence require dismissal in light of the factors referred to above? Other than where the third question receives an affirmative answer, we can conceive of no circumstances under which the absence of another possible claimant would deprive the plaintiff of the right to prosecute his cause of action.

■ In general, then, a former owner who suffered damage to the property while he owned it is a real party in interest for purposes of maintaining an action for damages, and may do so subject to any specific substantive limitations that may be triggered by the circumstances of his claim. In general, the viability of his claim may hinge on his ability to prove *damages*; if he sold the property for the same value it would have had in the absence of the defendant's conduct, and if he himself has not been sued by the purchaser, he is unlikely to establish any compensable harm. But such concerns furnish no basis for a categorical rule such as the one advocated by

defendants. More importantly, no such rule can be found in existing precedents concerning claims for property damage.

## IV. *Existing Authority Imposes No "Current Ownership Requirement" on Trade Secret Plaintiffs*

In view of the foregoing authorities and principles, defendants necessarily contend that trade secrets differ from other property in that their sale divests the seller not only of his property rights in them, but also of any right of action he had as a result of their misappropriation while they were his. Defendants have never identified any direct or persuasive authority for this proposition. Indeed they supply no evidence that any court, commentator, legislator, or other relevant actor has so much as *contemplated* the adoption of a rule such as they advocate here. This makes all the more remarkable the careful navigation by which they try to convey the impression of an existing "current ownership rule" without acknowledging the complete absence of authority adopting, or even proposing, such a rule.

In Marvell's original written presentation in the trial court, the only California authority it cited for the asserted requirement was the official California pattern jury instructions—whose "first element," Marvell asserted, "requires the plaintiff to be either the owner or the licensee of the trade secret. See CACI Nos. 4400, 4401." Marvell did not quote the cited instructions—for good reason. The most that can be said in favor of its reading is that the broader and less specific of the two instructions uses the present tense to refer to the requirement of ownership. That instruction, whose avowed purpose is "to introduce the jury to the issues involved" in a trade secrets case (Directions for Use for CACI No. 4400), describes the plaintiff as claiming that he "is" the "owner/licensee" of the trade secrets underlying the suit. (CACI No. 4400.) The second instruction, which enumerates the actual *elements* of the plaintiff's cause of action, dispels whatever weak whiff of relevance this use of the present tense might have. It requires the plaintiff to prove that he "own*ed*" or "*was* a licensee of" the trade secrets at issue. (CACI No. 4401, italics added.) Given only these instructions to go on, one would suppose that *past* ownership—i.e., ownership at the time of the alleged misappropriation—is sufficient to establish this element.

Marvell acknowledges the instruction's use of the past tense only in a footnote, and then only to accuse Jasmine of using it to posit a "loophole" to the effect "that being merely the former . . . owner of a trade secret is sufficient to confer standing." That is indeed what Jasmine contends, but it is hardly a "loophole." It is the most obvious implication of the very instruc-

tions Marvell cited to the trial court as firm authority for a current ownership requirement.

Nor does Marvell adequately address this language by asserting ipse dixit that the past tense is used in CACI No. 4401 "merely" to "account[]" for the situation where the defendant's misappropriation by disclosure has destroyed the trade secret, that is, where the trade secret no longer exists as a matter of law." This gloss supposes that the drafters of the instruction noticed the epistemological and linguistic conundrum that could arise from referring to present ownership of a thing that no longer exists, and sought to resolve it by introducing language that was affirmatively misleading. In our view the use of the past tense in CACI No. 4401 is far more plausibly explained by supposing that its drafters expected the right to recover to depend on the plaintiff's relationship to the trade secret *at the time of the accrual of the cause of action.* Whether that expectation was the product of pointed consideration, and whether it accurately reflects the law, are other questions. Certainly the instructions do not support the "current ownership rule" defendants attribute to them.

The other authorities cited by defendants, in the trial court and here, are of similar tenor. Under a heading, "The Current Ownership Requirement Is Nearly Universal," Marvell cites a string of treatises. One of these echoes CACI No. 4400 by using the present tense to describe the plaintiff's obligation to prove that he "is the owner of a trade secret." (4 Milgrim & Bensen, Trade Secrets (2009) § 15.01[1], p. 15-17 (rel. 91-8/2009).) The other two, by Marvell's own description, contain no temporal cues at all: "James Pooley, Trade Secrets § 12.04[1] (2009) ('the plaintiff has the burden of proof of . . . the existence and *ownership of secret information*'); Jager, Trade Secrets Law § 5:3 ('In an action for misappropriation of a trade secret, the *trade secret owner* . . . has the burden of proving both the existence of a protectable trade secret and the *ownership of the secret.*')" (Original italics, fn. omitted.) It requires no advanced skill in critical analysis to see that Marvell's own description of these sources says nothing about *current* ownership.

The same is true of Marvell's allusion to two statutory references to the "owner" of a trade secret, one in Evidence Code section 1060, which creates an evidentiary privilege to withhold trade secrets, and the other in Civil Code section 3426.11, which declares that the defense of privileged publication does not generally apply to trade secret disclosures. Neither of these statutes suggests a legislative distinction between past and present owners, and indeed to apply such a distinction to the *privilege*, at least, would lead to the

surprising result that the sale of a trade secret would strip it of the privilege and permit its compelled disclosure by the original owner. One would expect such a rule to substantially diminish, if not destroy, the secret's value to any would-be purchaser—an effect Marvell elsewhere insists we should be loath to impute to the CUTSA.

Defendant Sowell cites two published California cases, one of which merely quotes the other, and both of which echo CACI No. 4401 by using the *past* tense to describe the required element: "Under the UTSA, a prima facie claim for misappropriation of trade secrets 'requires the plaintiff to demonstrate: (1) the plaintiff *owned* a trade secret . . . .' " (*CytoDyn of New Mexico, Inc. v. Amerimmune Pharmaceuticals, Inc.* (2008) 160 Cal.App.4th 288, 297 [72 Cal.Rptr.3d 600], italics added, quoting *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1665 [3 Cal.Rptr.3d 279].) Neither case raised any question about the effects of the plaintiff's divesting himself of the underlying trade secret after the alleged misappropriation had damaged him. The federal cases cited by Sowell are even farther afield, and, as described by Sowell, are concerned only with what constitutes a sufficient interest in a trade secret to sustain a suit under the CUTSA—not *when* the plaintiff has to hold that interest.

In sum, defendants' entire argument is built upon references to "ownership," which defendants conflate, and would have us equate, with "*current* ownership." We may assume, and indeed there is no dispute for purposes of this action, that a plaintiff must be able to prove his status as an "owner" of the trade secret. The question is whether he must prove that he owns it *now*. Defendants do not squarely acknowledge, let alone address, this question. Instead they seek to obscure it with such observations as, "In many jurisdictions, ownership is considered a basic jurisdictional requirement." As we have recently observed, however, merely labeling something "jurisdictional" does not alter its meaning. (*Standard Microsystems Corp. v. Winbond Electronics Corp.* (2009) 179 Cal.App.4th 868, 889 [102 Cal.Rptr.3d 140].) Such a label is no more effective to convert "ownership" into "current ownership" than it would be to convert a car into a boxcar. Marvell's fulsome discussion about the nature of the interest required in various states and circuits, while undoubtedly of scholarly interest, has only the vaguest connection, if that, to the question defendants have raised here. The cited authorities do not appear to suggest that the plaintiff must hold a qualifying interest *at the time of suit*, let alone the time of trial or judgment. Ipso facto, none of them has any tendency to sustain defendants' argument—or the ruling here under scrutiny.

Marvell asserts in a heading that "The Current Ownership Requirement Is Reflected In CUTSA Legislative History, Related Statutes, And CACI

Jury Instructions." The ensuing argument does not really attempt to substantiate this assertion, but only to lend it an *illusion* of substance by shifting to Jasmine the burden of showing that these sources reflect an intention *not* to adopt a current ownership rule. A party cannot lend itself the shelter of a proffered rule merely by casting upon his opponent the burden of showing that the rule does not exist or does not apply. The party asserting the rule, like a party asserting any other thing on which his position depends, is ordinarily expected to come forward with some kind of *affirmative showing* of its existence. He is rarely permitted, merely by saying it is so, to cast upon his opponent a burden of proving that it is *not* so. This is particularly true here, where the implication of this attempt to shift the burden of persuasion is that Jasmine must come forward with affirmative evidence that the act was *not* intended to include a current ownership requirement—a rule that, so far as we can determine, no one had ever thought of. Even if the drafters or the Legislature had considered such a question, we are unaware of anyone who makes a practice, when drawing up a statute, of listing all the rules he does *not* intend to create.

Such support as Marvell professes to find in legislative history proves to be a mirage. First Marvell asserts that California legislators "intended to apply the same ownership rule adopted by other jurisdictions." But since it does not appear that any other jurisdiction has, or was believed by the Legislature to have, a current ownership rule, this premise leads nowhere. Similarly no substance is lent to defendants' position by the assertion that "[t]he legislative history . . . shows that the Legislature intended to protect the rights of owners, and did not conceive that any other party would have the right to assert such claims." (Fn. omitted.) But plaintiff *is* an owner—a former owner. The question is whether the Legislature intended to prescribe a rule whereby the owner of a trade secret *could not sell* his trade secret without *forfeiting* his right to sue for its misappropriation. None of the excerpted passages from the various sources cited by defendants suggests that anyone involved in drafting the uniform act, or adopting it in California, gave any consideration whatever to that question.[6]

V. *Adoption of a Current Ownership Requirement in Trade Secrets Cases Is Not Warranted by Analogy to Trademark, Patent, or Copyright Law*

Marvell's return is full of oblique assertions manifestly intended to suggest that a "current ownership rule" applies in federal patent and copyright cases,

---

[6] We grant defendants' motions for judicial notice of various legislative materials solely to observe, as appears from the foregoing discussion, that these materials add no apparent weight to defendants' arguments.

and is therefore appropriate by analogy in trade secrets cases. Sowell similarly asserts that trade secret law should follow the rule under "analogous types of intellectual property law (patent, trademark, and copyright law)"— which, he says, limit "standing" to "the owner of intellectual property." This is not entirely accurate, though we may accept it as such for present purposes. (See 8 Chisum on Patents (2006) § 21.03, p. 21-463 ["Who may and who must be made a party to a patent suit . . . is a subject that has engendered over the years many fine distinctions and some confusion."].)[7] For present purposes, however, we may accept the proposition as true. Once again it is beside the point, for the question is not whether the plaintiff must be an "owner" of the rights he sues upon but whether he must be an owner *now*. Once again, defendants' entire argument—if it can be called that—depends on simply ignoring the *temporal* qualification on which it depends.

 The suggestion of a "current ownership rule" in patent law proves to be yet another will-o'-the-wisp. The governing statutes grant the right to sue for infringement to a "patentee" (35 U.S.C. § 281), which is defined to include "*not only* the patentee to whom the patent was issued *but also* the successors in title to the patentee" (35 U.S.C. § 100(d), italics added). This suggests, that for purposes of the statute, a patentee retains that status—and thus the right to sue—even after passing title to another. His ability to state and prove a claim, of course, is another matter, but the cited language hardly supports the premise that he forfeits his right to sue merely by transferring his interest to another.

Nor does a current ownership rule find any support in any patent cases we have found. Indeed on scrutiny even the cases cited by defendants, to the extent they are not simply irrelevant, point inexorably to the opposite rule: that suit may, and usually must, be maintained by the person who owned the patent *when the infringement occurred.* Thus Marvell cites *Crown Co. v. Nye Tool Works* (1923) 261 U.S. 24 [67 L.Ed. 516, 43 S.Ct. 254] (*Crown Co.*), to illustrate the federal courts' "long . . . recogni[tion]" of an "ownership standing rule." But the question in that case was whether an *assignee* of the patent-in-suit could maintain a claim for *preassignment* infringement.[8] In

---

[7] "The fundamental starting point is that the interested parties should be, on the one hand, the owner of the patent, and on the other hand, the accused infringer. In many cases, this simple adversary situation is present, and there is no serious parties problem. However, a parties problem may arise when there are transfers of interests in the patent. The original patent owner may assign the patent on certain terms (that is, transfer title). The transfer may be of a whole or partial interest. The patent owner (or his assignee) may also grant one or more licenses on a variety of terms. Thus, a number of persons may acquire interests in the patent, and the question arises as to who may file suit against an infringer and who of the other interested persons must be joined." (8 Chisum on Patents, *supra*, § 21.03, p. 21-463.)

[8] This indeed is the context in which questions of "standing" to sue for patent infringement seem to most often arise, i.e., as a challenge to the right of a *transferee* to maintain a suit for

addressing that question, the court reaffirmed the analysis in *Moore v. Marsh* (1868) 74 U.S. 515 [19 L.Ed. 37] (*Moore*), which it described as deciding a question precisely analogous to the one before us: "whether a sale and assignment by a patentee of his patent right" was, under the then governing statute, "a bar to an action by him to recover damages for an infringement committed before such sale and transfer." (*Crown Co., supra*, 261 U.S. at p. 41.)[9] In *Moore* the court had answered this question with an unequivocal *no*, declaring, "Subsequent sale and transfer of the exclusive right are no bar to an action to recover damages for an infringement committed before such sale and transfer." (*Moore, supra*, 74 U.S. at p. 522.) While not directly presented with this same question, the court in *Crown Co.* ratified *Moore*'s reasoning, which was that the statute authorizing suit " 'in the name or names of the person or persons interested' " must be taken to mean the person interested "when the infringement occurred and the cause of action accrued." (*Crown Co., supra*, 261 U.S. at pp. 41–42; see *Moore, supra*, 74 U.S. at p. 522 ["the right of action is given to the person or persons owning the exclusive right at the time the infringement is committed"].)

The right of the former owner to sue for pretransfer infringement appears well enough settled that some defendants, at least, would rather not waste resources litigating it. In one of the cases cited by Marvell, the defendant *conceded* a former owner's right to recover for infringement occurring prior to a transfer of the patent. (*Mars, Inc. v. Coin Acceptors, Inc.* (Fed.Cir. 2008)

---

pretransfer infringement—or, often, to sue at all. Nearly all of the cases cited by defendants fall into this category. (See *Crown Co., supra*, 261 U.S. 24, 39, 43 ["attempted assignment" did not convey sufficient interest to permit assignee to sue for posttransfer infringement; nor did it effectively convey assignor's exclusive right to sue for pretransfer infringement]; *Ind. Wireless Co. v. Radio Corp.* (1926) 269 U.S. 459, 472–473 [70 L.Ed. 357, 1926, 46 S.Ct. 166] [licensee suing in equity may join predecessor in interest as involuntary plaintiff where latter is indispensable party]; *Morrow v. Microsoft Corp.* (Fed.Cir. 2007) 499 F.3d 1332, 1336–1337, 1341 [whether trustee of special bankruptcy trust acquired bankrupt's right of action for infringement]; *Prima Tek II, L.L.C. v. A-Roo Co.* (Fed.Cir. 2000) 222 F.3d 1372, 1377–1378 [whether transfer to plaintiffs was tantamount to assignment so as to exempt case from rule requiring joinder of original owner]; *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA* (Fed.Cir. 1991) 944 F.2d 870, 876 [transferee could sue under agreements effectively assigning all transferor's interests and expressly including "the sole right to sue for all infringements, past, present, and future"].) Another of Marvell's citations is even farther afield: *Viskase Corp. v. American Nat. Can Co.* (Fed.Cir. 2001) 261 F.3d 1316, 1328–1329, the cited portion of which held that a correction of inventorship while the action was pending had not been shown to affect the plaintiff's right to sue.

[9] Defendants do not mention *Moore*, although it has been cited on this point many times, including recently. (See *Arachnid, Inc. v. Merit Industries, Inc.* (Fed.Cir. 1991) 939 F.2d 1574, 1579, quoting *Moore, supra*, 74 U.S. at p. 522 [in absence of explicit transfer of right to sue for pretransfer infringement, right continues to belong to " 'the person or persons owning the exclusive right at the time the infringement is committed' "]; *Alloc, Inc. v. Pergo, Inc.* (E.D.Wis. 2008) 572 F.Supp.2d 1024, 1028; *McNulty v. Taser Int'l Inc.* (C.D.Cal. 2002) 2002 U.S.Dist. Lexis 6810, p. *7; *Waymark Corp. v. Porta Sys. Corp.* (S.D.Fla. 2000) 2000 U.S.Dist. Lexis 22462, p. *12, revd. in part on other grounds (Fed.Cir. 2001) 245 F.3d 1364.)

527 F.3d 1359, 1364.) This concession was ineffectual if, as defendants assert here, the transfer deprived the former owner of "standing," for—as emphasized in another case cited by *Marvell*—a federal court would view such a defect as depriving it of *jurisdiction.* (See *Prima Tek II, L.L.C. v. A-Roo Co., supra*, 222 F.3d 1372, 1376, quoting *Warth v. Seldin* (1975) 422 U.S. 490, 517–518 [45 L.Ed.2d 343, 95 S.Ct. 2197] [" 'The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention.' "]; *Fuji Photo Film Co., Ltd. v. International Trade Com'n* (Fed.Cir. 2007) 474 F.3d 1281, 1289.) Instead the *Mars* court accepted the concession, and while reversing the judgment in other respects, remanded for a "recalculation of damages" suffered by the former owner from pretransfer infringement. (*Mars, Inc. v. Coin Acceptors, Inc, supra*, 527 F.3d at p. 1374.)

Despite the seeming clarity of the former owner's right, an argument similar to defendants' has been raised in a few cases. So far as we can tell, courts have uniformly rejected it and ratified *Moore*'s holding that the former owner is entitled to sue for pretransfer infringement. In *Alloc, Inc. v. Pergo, Inc., supra*, 572 F.Supp.2d 1024, the defendants contended that the plaintiffs lacked standing because they had no "proprietary interest in the patents-in-suit." (*Id.* at p. 1027.) The court rejected this contention, writing, "A 'right of action is given to the person or persons owning the exclusive right [to use the patents-in-suit] at the time the infringement is committed.' [Citations.] Assignment or termination of the proprietary interest in the patents-in-suit does not abrogate this right of action unless it is also accompanied by an explicit assignment of all causes of actions, including the right to sue for past infringement. [Citation.]" (*Id.* at p. 1028.) The plaintiffs had not assigned their rights of action for infringement during their ownership; on the contrary, they had expressly reserved those—as Jasmine did here. (*Ibid.*) Accordingly they were entitled to sue.

The same result was reached in *Diodem, LLC v. Lumenis Inc.* (C.D.Cal. 2005) 2005 U.S.Dist. Lexis 46865, an unpublished district court decision cited by Marvell, but on a different point.[10] There the patent holder, Diodem, sued several defendants for infringement, and then settled with one defendant by selling the patent to one of the latter's subsidiaries. The remaining

---

[10] This decision is cited by Marvell in ambiguous proximity to the statement that "the current patent owner is generally deemed an indispensable party to infringement litigation." This appears to be a gross overgeneralization at best. Certainly it is not supported by *Diodem.* The court there held that the current owner of the patent was a " 'necessary party' " who must be "joined if feasible." (*Diodem, LLC v. Lumenis Inc., supra*, 2005 U.S.Dist. Lexis 46865 at p. *48.) Since joinder was feasible, and was ordered, the court did not reach the question whether the current owner was an "indispensable party" whose absence would require dismissal. (*Id.* at p. *47.)

defendants moved to dismiss on the ground, among others, that the sale "deprive[d] Diodem of standing to continue with this action since [it] no longer owns the rights to the patent." (2005 U.S.Dist. Lexis 46865 at pp. *4–*5.) The court squarely rejected this contention, declaring, "The 'transferor [of a patent] retains the right to sue for pre-transfer infringements *unless that right is expressly included in the transfer.*'" (*Id.* at p. *19; see 8 Chisum on Patents, *supra*, § 21.03[2][g][i], p. 21-510 [same, as a corollary of the more general rule that "[t]he right to sue for damages for infringement rests in the person who held the appropriate ownership interest in the patent at the time the infringing acts occurred"].) Because "the sale reserved to Diodem the right to pursue past claims against infringers, including the claims set forth in the present lawsuit," the seller was entitled to continue to prosecute those claims. (2005 U.S.Dist. Lexis 46865 at p. *5.)

Nor does the rule appear to be any different in copyright law. The one copyright case cited by Marvell, *Silvers v. Sony Pictures Entertainment, Inc.* (9th Cir. 2005) 402 F.3d 881, concerned the right of a *transferee* of intellectual rights to sue for pretransfer infringement. The specific question was whether the owner of the copyright to a work-for-hire could effectively transfer to its author the right to sue for a particular instance of claimed infringement. In a pattern by now wretchedly familiar, Marvell quotes the court's statement that "a party that has no ownership interest has no standing to sue." (*Id.* at p. 890; see *id.* at p. 889 ["only the owner of an exclusive right under the copyright is entitled to sue for infringement"].) They do not mention the court's statement that "in order for a plaintiff to be 'entitled . . . to institute an action' for infringement, the infringement must be 'committed *while he or she is the owner* of' the particular exclusive right allegedly infringed." (*Id.* at p. 885, quoting 17 U.S.C. § 501(b), italics added.)

The copyright authorities we have found confirm the right of a former owner to sue for pretransfer infringement. In *ABKCO Music, Inc. v. Harrisongs Music, Ltd.* (2d Cir. 1991) 944 F.2d 971, 980, the court summarized the applicable principles as follows: "The legal or beneficial owner of an exclusive right under a copyright is entitled to bring actions for infringements of that right occurring *during the period of its ownership.* 17 U.S.C. § 501(b). Thus, a copyright owner can assign its copyright but, if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them. [Citations.] Rather, the assignee is only entitled to bring actions for infringements that were committed while it was the copyright owner and *the assignor retains the right to bring actions accruing during its ownership of the right, even if the actions are brought subsequent to the assignment.* [Citation.]" (Italics added; see *M. J. Golden & Co. v. Pittsburgh Brewing Co.* (W.D.Pa. 1956) 137 F.Supp. 455, 457 ["even though there has been a sale of the copyright this does not prevent the owner at the time of the alleged infringement from suing for previous damages it

alleges to have sustained while it was the owner"]; 3 Nimmer on Copyright (2009) § 12.02[B], p. 12-59 (rel. 77-12/2008) ["Absent [an] unusual circumstance, *only the grantor*, not the grantee, has standing to sue for pre-grant infringement, even if the action is filed after the grant has been executed." (fns. omitted, italics added)].)

■ In sum, we have failed to discover—as defendants obviously have—a single case where the transferor of an intellectual property right was held to have lost, *merely by conveying his interest in that right*, the right to sue for its pretransfer infringement. We are confident that there is no such case, or that if there is, it defies the overwhelming weight of authority.[11]

### VI. *No Demonstrated Policy Concern Preponderates in Favor of a Current Ownership Requirement*

Marvell asserts that "the current ownership requirement is anchored in important public policies." This construction exemplifies an irksome rhetorical device that pervades Marvell's presentation—the tacit but persistent begging of the question, or *petitio principii*, by which the speaker attempts to establish his point by acting as though it has already been proven. This device works all too often, either by simply bowling over the listener or by inflicting such bewilderment that he comes to suspect some deficiency in his own understanding, and succumbs to the asserted point to avoid criticism or self-doubt. In a collective setting, the undemonstrated point may by this means gather the momentum of consensus, eventually becoming so widely accepted that only the hardiest will continue to question it.

Marvell employs, in short, an "emperor's new clothes" strategy, constantly speaking *as though* a "current ownership rule" exists without ever undertaking to show that it *does* exist. Of course a major part of our job is to resist such devices, and to declare, when so it seems to us, that the emperor in fact

---

[11] We must also point out that decisions concerning the right to sue for patent and copyright infringement are closely tied to the language of the governing statutes. "A patent is a creature of statute, as is the right of a patentee to have a remedy for infringement of his patent. Suit must be brought on the *patent*, as ownership only of the invention gives no right to exclude, which is obtained only from the patent grant. In order to exercise that right, a plaintiff must necessarily have standing as comprehended by the patent statute." (*Arachnid, Inc. v. Merit Industries, Inc., supra*, 939 F.2d at pp. 1578–1579, fns. omitted; see *Silvers v. Sony Pictures Entertainment, Inc., supra*, 402 F.3d at pp. 883–884 ["the only rights that exist under copyright law are those granted by statute"].) In order to successfully argue for adoption "by analogy" of the rules governing those causes of action, defendants would have to draw some parallel between the *statutory language* on which those rules ultimately rest, or at least the policy underlying that language, and the language or policy of the CUTSA. This they have made no attempt to do. It is not a task we are prepared to undertake for them, for we see no reason to suppose that it would be more than another snipe hunt.

has no clothes. And Marvell's imperator is naked as a jaybird. So far as we can tell, there simply *is* no "current ownership rule," in this or—apparently—any jurisdiction, in trade secret law or—apparently—any other field of intellectual property. The question, then, is not why such a rule exists—as Marvell seeks to frame it—but whether such a rule *should* exist; not whether the emperor *is now wearing* a splendid suit, but whether such garb *should be made* for him. Out of respect for the possibility that it should, we will attempt to determine whether Marvell's "public policy" assertions furnish suitable fabric for such a garment.

Marvell suggests that a current ownership rule is necessary to avert the risk posed by a suit such as this one to "the rights of the actual [i.e., current] owner" of the secret. In other words, Marvell would have us sacrifice the *actual* rights of past owners to protect against *possible* hazards to current owners. The law deals with conflicting or potentially conflicting interests all the time, and it rarely finds it prudent or just to categorically obliterate the interests of a whole class of claimants to ward off *potential* dangers to *possible* claimants. Nor does Marvell provide any plausible basis for such a regime here.

Marvell suggests that the proposed rule would have the salutary effect of "prevent[ing] adjudication of a property right when the current owner of the underlying property is absent from the suit." This is an argument not for barring the former owner's suit, as defendants would have us do, but for joining the current owner in the suit. The same is true of Marvell's allusion to the supposed "requirement that all co-owners of a patent must join to sue for infringement." The treatise cited for this requirement, moreover, is discussing the "standing" of *simultaneous* owners, not *successive* owners. (See 2 Dratler, Licensing of Intellectual Property (2008) § 8.01[2], p. 8-8 ["the specific consequences of co-ownership, including co-owners' rights to profits inter se and their respective standing to sue nonowner infringers, depend strongly upon the type of intellectual property involved"].) According to it, the rationale for the joinder requirement is to "preclude[] any single co-owner from putting the patent's validity at risk in an infringement action without the other co-owners' consent." (*Ibid.*) Even if this rationale were extended to successive owners, we fail to see how it could apply here, where the current owner took the property with actual notice of the litigation, which was then pending, and thus had every opportunity to assess the attendant risks and factor them into its purchase decision.[12] Marvell points us to no authority,

---

[12] The purchase agreement explicitly carved out, as "Seller's Retained Interest," Jasmine's "rights, title and interest in and to any claims, actions, or omissions related to the possible infringement, misuse, or misappropriation of the Purchased Assets that commenced prior to the Closing Date (and the rights to refer such matters to criminal authorities and/or collect damages and seek appropriate relief therefor), including all rights, title, and interest in and to

and we have seen none, requiring all patent infringement plaintiffs to join their predecessors and successors in interest, regardless of the nature of the claim.

■ Nor are we impressed by Marvell's assertion that in the patent setting, "the mere act of bringing suit often destroys the underlying IP [i.e., intellectual property] that is the basis for the claim." To begin with, this is a gross, if not histrionic, distortion. It is not "the mere act of bringing suit," but the potential *adverse disposition* of the suit, that may destroy a patent-in-suit. The same is true of any legal right asserted as the basis for a suit: If an adverse adjudication results, the right asserted will have been "destroyed," to the detriment not only of the plaintiff, but potentially of others, most certainly including those whose interests depend on the asserted right, or whose own similar rights will be precluded by it. Where the interests of such third persons are deemed sufficient to warrant concern, however, the preferred approach is either to encourage, and sometimes require, their *joinder*, or to limit the conclusive effects of the judgment. We see nothing peculiar about patent or trade secret claims in this regard.

■ Nor do we see any reason to suppose that the successor to a trade secret lacks adequate protection against the potential adverse consequences of ongoing litigation conducted by his predecessor. At least where he purchases with knowledge that matters affecting its value are being litigated—as the buyer did here—he can take several steps to protect himself. First and most obviously, no one is holding a gun to his head when he makes the purchase. After examining the pleadings and such related documents as he sees fit to examine—including any he may require the seller to make available—he can fix his maximum price to reflect those risks. He can insist on suitable warranties and undertakings by the seller. If he is not satisfied that the risks are adequately addressed, he is free to walk away from the transaction. Once he has taken possession of the secret he may, if he thinks it worthwhile, seek to join in the litigation, most obviously by petition to intervene. (See Code Civ. Proc., § 387.) Indeed he might condition his entry into the purchase agreement, or his later performance, on the seller's agreement to seek or support such joinder.

Indeed *all* of the concerns raised by Marvell would appear to be more suitably addressed under the rubric of joinder than under a categorical limitation on a former trade secret owner's right to sue. If the successor is deemed indispensable, and cannot be joined, then dismissal may be justified

the Pending Litigation . . . ." "Pending Litigation" was defined as "*Jasmine Networks, Inc. v. Marvell Semiconductor, Inc. et al.* (Santa Clara County Superior Court, Case No. CV801411, filed September 12, 2001), and all related legal matters, whether civil or criminal, including all rights and appeals related thereto."

under the compulsory joinder statute. (See Code Civ. Proc., § 389, subd. (b).) But such concerns have no discernible bearing on whether the seller should be permitted to sue in the first instance. We have no reason to think that those who drafted the uniform act, or those who adopted it into California law, supposed otherwise.

Marvell observes that the *defendant* in the previous owner's suit has an incentive to attack the validity of the claimed trade secret, thereby threatening the current owner's interests. Marvell takes this opportunity to describe the devastating attack it expects to launch upon Jasmine's claims, including evidence that will show, according to Marvell, that the trade secrets in question were derived from another source, and merely "pawn[e]d off" by Jasmine as its own. Evidence to that effect might indeed harm the current owner in any attempt to resell the trade secret or to protect it against future use by others. But all kinds of litigation may produce undesirable effects on third parties. If two people are publicly accused of committing embarrassing acts together, and one of them sues for defamation, the defendant will have an incentive to prove matters that will embarrass not only the plaintiff but also the alleged partner in shame. No one would suggest that this risk poses a bar to the plaintiff's maintaining the suit. The law must tolerate some such incidental effects unless it is to sacrifice other, paramount concerns—such as the right to seek redress for legal wrongs.

Next Marvell alludes to a "series of claims" *by Jasmine* "that are fundamentally at odds with Teradiant's rights and interests (and any ongoing value of the assets), including claiming that the trade secrets' value was entirely destroyed in 2001 and that the trade secrets were incapable of being valued individually (and thus monetized as assets)." In support of this assertion Marvell cites various pages of the record, most of which reflect Jasmine's theory of damages as presented to the trial court. We are at a loss to see how such statements, in Marvell's words, "threaten[] the existence or value of the property held by Teradiant." Value is what a willing buyer would pay a willing seller. We are not aware of commercial actors who would suffer the preemption of their own judgment about value by a jury verdict, let alone the arguments of attorneys. Marvell speaks of "the risk of invalidation" and the danger that "the alleged property . . . would be found entirely invalid," as if the property at issue were a patent. But it is not a patent. It is one or more trade secrets. If this case results in an adjudication that one or more of the asserted trade secrets does not in fact possess that status, the present owner of that secret will either be bound by the judgment or it will not. If it is bound, the remedy is (or was) to seek its joinder—at its own behest, on motion of a party, or on the court's own motion. If it is not bound, then anyone who fails to respect the trade secret as such—e.g., by disclosing it to another, or using it—does so on peril of a lawsuit from the current owner, the earlier judgment

notwithstanding. None of these possibilities suggests any reason to restrict Jasmine's right to maintain this suit.

Marvell asserts that the threat this action poses to Teradiant is illustrated by a letter from Jasmine's counsel confirming his advice to the superior court clerk that Jasmine no longer insisted on the sealing of any material filed with the court. The letter was apparently written in response to communications from the clerk concerning the complications that would arise from attempting to maintain a sealed record. (See Cal. Rules of Court, rules 2.550, 2.551.) Counsel wrote that he had unsuccessfully sought the cooperation of Marvell's attorneys in unsealing all records by stipulation. He had hoped they would agree to this, he wrote, "because the case has gone on since 2001. At the outset, there was an Order to seal certain materials but Jasmine no longer sees any necessity to do so."

Apparently Marvell hopes to evoke umbrage at Jasmine's willingness to suffer the public disclosure of information that Teradiant might wish to keep secret. Thus Marvell asserts that there is "no evidence Jasmine consulted with Teradiant before" sending this letter. Perhaps not, but that hardly suggests a basis for dismissing Jasmine's suit. No doubt Teradiant would be in a surer position to protect its interests if it were made a party. Since Marvell has apparently made no attempt to bring that about—indeed, appears never to have raised the point before seeking to dismiss the action on the eve of trial for want of "standing"—its protestations in this regard ring hollow.

Marvell attempts to equate the transaction here with an assignment of a patent or copyright right of action, when it far more closely resembles the *retention* of such a right of action by its original owner. Far from offending the policies of those bodies of law, such retention is, as we have noted, the presumptive and favored result of a transfer of the underlying property right. Marvell alludes to the inability to create "standing" in patent or copyright law by contract, but this describes the opposite of the situation before us, where *defendants* are pointing to a contract to *divest* Jasmine of "standing." Most bewildering of all is the suggestion that there was no "meeting of the minds" in the sale to Teradiant because the contract contained a recital or warranty by Jasmine that there had been no misappropriation of the assets conveyed to Teradiant. Accepting this extremely dubious assertion as true, we can conceive of no process by which it would deprive Jasmine of its right of action.

Marvell points to a second major public policy that supposedly warrants a current ownership rule: "avoiding multiplicity of suits and inconsistent judgments." For the most part, however, the ensuing discussion merely recapitulates the points we have already discussed—and rejected. If anything it only demonstrates more vividly the shallowness of Marvell's professed

concern for Teradiant's interests. Thus Marvell writes, "Jasmine's damages theory is that Marvell's alleged misconduct destroyed the claimed trade secrets' value altogether . . . ." "[T]his position is at odds with the current owner's interests. Teradiant has an incentive to assert that these secrets were and continue to be highly valuable, and that Marvell is using them in its products. The perfect inconsistency of these two positions illustrates how allowing non-owners to sue leads to multiple suits and inconsistent judgments."

The most that can be said for these statements is that *if Teradiant were ever to sue* Marvell (or anyone else) for using the technology Teradiant purchased from Jasmine, Teradiant would be expected to take the position that, contrary to Jasmine's position here, the technology continued to have value. If that contention succeeded, it might indeed lead to a judgment that was factually inconsistent with the one Jasmine seeks here. In theory at least, Marvell might find itself paying damages to Teradiant that it had already, in effect, paid to Jasmine. But as we have repeatedly observed, if Marvell thought that was a serious risk it had a ready means to protect itself against such a possibility: It could have sought Teradiant's joinder in this action.

As it is, Jasmine reserved from its sale to Teradiant "its rights, title and interest in and to any claims, actions, or omissions related to the possible infringement, misuse, or misappropriation of the Purchased Assets that *commenced prior* to the Closing Date," specifically including the claims asserted in this action. (Italics added.) Marvell asserts that this reservation of rights does not deprive Teradiant of a potentially conflicting interest because Jasmine "conveyed *to Teradiant* 'the right to sue for *all past*, present, and future infringements,' without qualification." The quoted language appears in documents effecting the assignment of Jasmine's *copyright, patent, and trademark rights* in the technology purchased by Teradiant. It is not apparent that the assignments of these rights conflict in any way with the *trade secret* claim at the heart of this case, or that if they did, the resulting ambiguity would be resolved in the manner implied by Marvell. More basically, however, these are simply not matters which Marvell can now raise as impediments to this suit. If it was concerned about its own potentially conflicting or duplicative liability to Teradiant, it had every opportunity to raise that concern in a timely manner by the means we have described. The rights of Teradiant, which has known of this suit at all relevant times, are simply none of Marvell's business. In the end, it is Marvell, not Jasmine, who seeks to assert *jus tertii*. Assuming it had "standing" to do so—at least to the extent of seeking to bring the third party in question before the court—it has failed to exercise it in the manner provided by law. Jasmine's sale of the trade secrets in question is not an impediment to its maintenance of this action.

## DISPOSITION

Let a peremptory writ of mandate issue directing the trial court to set aside its order dismissing plaintiff's claims, and to proceed with their adjudication in a manner consistent with this opinion. Costs to petitioner.

Premo, J., and Elia, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied February 10, 2010, S180053.